## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

Case No. 21-44887

**SILVERSIDE SENIOR LIVING,**
**LLC, et al.,** [1]

Chapter 11

Hon. Lisa S. Gretchko

Debtors.

Jointly Administered

_____/

## DEBTORS' PLAN OF LIQUIDATION

## INTRODUCTION

Silverside Senior Living, LLC ("Silverside") and Graceway South Haven, LLC ("Graceway"), as Debtors and Debtors in Possession in the above-styled case (collectively, the "Debtors"), by and through their attorneys, Strobl Sharp PLLC, propose the following Plan of Liquidation (the "Plan" or "Liquidating Plan") pursuant to 11 U.S.C. §§ 1190 and 1191. The Plan is presented to you to inform you of the proposed distribution of the Debtors' assets and to seek your vote to accept the Plan.

As a Creditor, your acceptance of this Plan is extremely important to the Debtors. You are encouraged to carefully review the full text of this Plan, including all exhibits and attachments, before deciding how to vote on the Plan.

---

[1] The debtors in these jointly administered proceedings along with the last four digits of their respective federal tax id numbers are Silverside Senior Living, LLC (2357) [Case No. 21-44887-lsg] and Graceway South Haven, LLC (9393) [Case No. 21-44888-lsg].

In addition to casting your vote to accept or reject the Plan, you may object to confirmation of the Plan. If you wish to object, you must do so by October 13, 2021. Your ballot stating how you are voting on the Plan must be returned so that it is received by October 13, 2021. The ballot must be forwarded to Lynn M. Brimer by either mailing such ballot to the following address: Lynn M. Brimer, Strobl Sharp PLLC, 300 E. Long Lake Road, Ste. 200, Bloomfield Hills, Michigan 48304; or emailing the ballot to lbrimer@strobllaw.com.

A hearing on confirmation of the Plan is scheduled for October 22, 2021, at 1:00 p.m. before the Honorable Lisa S. Gretchko, in Courtroom 1975, 211 West Fort Street, Detroit, Michigan 48226. Your rights may be affected by this Plan. You should consider discussing the Plan with an attorney.

## ARTICLE I
## HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTORS

### 1.1    Nature of the Debtors' Businesses

Prior to the Petition Date, Graceway operated a skilled nursing facility located in South Haven, Michigan. On the Petition Date, Graceway maintained a Certificate of Need ("CON") issued by the State of Michigan, Department of Health and Human Services for a 93-bed facility. Silverside is Graceway's sole member. Silverside was originally established as a management company to own and oversee the management and administration of skilled nursing facilities.

2

Graceway was the first facility Silverside acquired and began providing management services to Graceway in 2019. However, by 2020, Graceway was directly managing its own operations and Silverside has had no active operations since mid-2020.

### 1.2    History of the Business Operations of the Debtors

Silverside, a Michigan limited liability company, was originally organized in March 2018 as ACM Senior Living, LLC ("ACM"). Its members are Airmed Capital Holdings (77.0%), SSC Holdings, LLC (10%), Mark Prifogle (10%) and Sajad Zalzala (3%). In February 2019, ACM changed its name to Silverside Senior Living, LLC. ACM was formed with the intent of acquiring, the sole member, skilled nursing facilities throughout the State of Michigan and establishing independent limited liability companies.

On September 6, 2018, Silverside organized Graceway to operate a skilled nursing facility in South Haven, Michigan. On October 31, 2018, Silverside entered into a twenty-year lease with Chippewa Valley, LLC, an Illinois limited liability company, for the property located at 120 Baseline Road, South Haven, Michigan (the "Baseline Property") (the "Chippewa Lease"), with the intent of assuming the operations of the skilled nursing facility known as Countryside Nursing and Rehabilitation Community (the "Countryside SNF") from the then

3

tenant of that location, Atrium Centers, Inc. ("Atrium").  Graceway was the agreed

subtenant under the Chippewa Lease.

In January 2019, Atrium continued operations and began the transition to

Graceway.   Graceway was awarded Countryside SNF's 93-bed CON by the State

of Michigan and in February 2019 assumed Countryside SNF's operations

independent of Atrium.

### 1.3    Events Leading to the Filing of the Debtors' Chapter 11 Case

A number of factors contributed to the financial condition of the Debtors

necessitating the filing of these Chapter 11 cases.   Unfortunately, the licensing

process after Graceway assumed responsibility for Countryside SNF's operations

took much longer than anticipated.   The Medicaid license was not issued until

November 2019, more than eight (8) months after Graceway assumed operations.

As a result, Graceway was compelled to borrow funds from multiple sources,

including Atrium and various accounts receivable factoring companies, to bridge

the revenue gap while waiting for reimbursement revenue.   By late 2019,

Graceway's license was issued and it began receiving reimbursements under

Medicare.

As census numbers trended upwards and revenue improved, Graceway no

longer needed the support of the factoring companies.  However, in order to ensure

sufficient cash flow to support growth, on March 23, 2020, the Debtors entered

4

into a Credit Agreement with Chippewa for a revolving line of credit based on a borrowing base formula with an initial credit limit of $500,000 (the "Line of Credit") with a maturity date of March 22, 2021. The Credit Agreement required the Debtors to establish a lockbox account with Fifth Third Bank ("Fifth Third") for the deposit of the Graceway receivables. On April 10, 2020, Silverside and Graceway each entered into a Deposit Account Control Agreement (DACA) with Fifth Third, thereby effectively surrendering control over the Debtors' receipts to Chippewa. As receivables were deposited into the DACA account, Chippewa swept the account and advanced new funds under the Line of Credit to the Debtors. Consequently, once the Line of Credit was in place, all cash disbursements were made with funds advanced by Chippewa – essentially ballooning the Debtors' debt.

Contemporaneous with the Chippewa's demand for the DACA accounts, COVID-19 hit Michigan, taking a significant toll on the skilled nursing home industry in general and Graceway in particular. In late spring 2020 Graceway was hit by a COVID-19 outbreak, causing further financial stress for the operations. Chippewa increased the line of credit to $750,000.00 in order to ensure adequate availability to cover expenses.

By late 2020, the loss of census due to the impact of COVID-19, caused Graceway to seek alternative avenues for recovery, including a potential sale of its

CON and the assignment of the Chippewa Lease to a new operator. Under pressure from Chippewa to transition the CON, the Chippewa Lease and the Countryside SNF's operations to a Chippewa preferred purchaser, Graceway began marketing its operations to determine if there was a viable purchaser that was willing to buy directly from the Debtors for the benefit of the Debtors' creditors.

The Debtors received a number of inquiries and several parties exhibited an interest in investigating the possibility of the transaction. However, due to Graceway's unpaid Michigan bed tax and the reluctance of Chippewa to cooperate with Graceway in its efforts to sell the CON and assign the Chippewa Lease, no purchaser was willing to extend a firm offer.

By May 2021, Graceway's cash flow difficulties became even more severe. Chippewa was unwilling to release sufficient funds to allow Graceway even to cover its payroll obligations. By late May 2021, the State of Michigan, Department of Licensing and Regulatory Affairs ("LARA") was working with Graceway to ensure the health and safety of its residents. Ultimately, on May 27, 2021, with the assistance of LARA, Graceway moved all of its residents to alternative facilities.

Left with no residents or source of revenue, the Debtors had no option but to file for bankruptcy protection in order to trigger the protections needed to complete

the Debtors' accounting, marshall and liquidate the Debtors' assets for the benefit of creditors and complete an orderly winddown of the entities.

### 1.4 Legal Structure of the Ownership of the Debtors

Silverside, a Michigan limited liability company, was originally organized in March 2018 as ACM Senior Living, LLC ("ACM"). Its members were Airmed Capital Holdings (77.0%), SSC Holdings, LLC (10%), Mark Prifogle (10%) and Sajad Zalzala (3%). Graceway is a Michigan limited liability company. Silverside is its sole member.

### 1.5 Debtors' Assets/Liquidation Analysis

### 1.5.1 Pre-Petition Assets

In order to evaluate the Plan, Creditors must consider the liquidation analysis of the Debtors' assets. On the Petition Date, Silverside's sole asset was its interest in Graceway. Graceway owned personal property assets consisting of the following:

> a. Furniture and equipment used in the operation of its business (the "Tangible Personal Property");
> b. Leasehold interest in the Baseline Property;
> c. Accounts receivable; and
> d. Certificate of Need.

Pursuant to paragraph 6.3 of the Chippewa Lease, upon the termination of the lease, the personal property within the facility used in the operation of Graceway's business became the property of Chippewa. It should be noted that

7

Debtors contacted several auctioneers post-Petition, including an auctioneer specializing in medical and healthcare assets. Due to the *de minimis* value and the condition of the personal property and the costs associated with removing and storing the assets, the Debtors have surrendered the Tangible Personal Property to Chippewa in connection with the termination of the Chippewa Lease. Consequently, the Tangible Personal Property assets have no value to the Debtors' estates or their creditors.

The Debtors estimate that on the Petition Date the Graceway collectable accounts receivable had a value of approximately $250,000. In the ordinary course of winding down its operations, Graceway has engaged a billing company to pursue the accounts receivable.

In addition, after Graceway's reconciliation of the resident funds on deposit, there were excess funds available for credit against accounts receivable in the amount of $6,475.15.

Based on the foregoing, on the Petition Date there was approximately $256,478.15 in value in the Debtors' prepetition assets.

The Debtors' liquidation analysis is attached as **Exhibit E**.

### 1.6    Debtors' Liabilities

#### 1.6.1  Chippewa Valley Debt:  Chippewa holds claims against the Debtors for the balance due in connection with the Credit Agreement,

the unpaid pre-petition rent and the Chippewa Lease obligations. Chippewa has filed a UCC-1 Financing Statements against both Silverside and Graceway. The Chippewa UCC-1 Financing Statement filed against Silverside on February 5, 2019 is junior to the UCC-1 Financing Statement filed by Healthteq Services, LLC ("Healthteq") on February 4, 2019. However, as of the Petition Date, Silverside has no assets, other than its interest in Graceway, to secure the claims of Healthteq or Chippewa. Consequently, any secured claims against Silverside asserted by either Healthteq or Chippewa have no value.

Chippewa filed two (2) UCC-1 Financing Statements against Graceway on March 24, 2020 and April 3, 2020. The Chippewa secured claim against Graceway is junior to the claim of McKesson Corporation which filed its UCC-1 Financing Statement on January 18, 2019 and the claim of High Speed Capital LLC which filed its UCC-1 Financing Statement on January 7, 2020.

The Debtors have agreed to grant Chippewa a post-petition security interest in the ERC after the application of a carveout for the payment of the Debtors' professional allowed fees, the priority wage claims, the Health Care Ombudsman and the fees of the Subchapter V Trustee.

### 1.6.1 **McKesson Corporation**

McKesson Corporation filed a UCC-1 Financing Statement on January 18, 2019. McKesson Corporation is the first secured creditor in Graceway's prepetition assets. On the Petition Date, Graceway's balance due to McKesson was $42,452.65.

### 1.6.2 **High Speed Capital LLC**

High Speed Capital LLC filed a UCC-1 Financing Statement against Graceway on January 7, 2020 in connection with receivables financing extended to Graceway. High Speed Capital LLC holds an all assets lien against Graceway's prepetition assets. On the Petition Date, Graceway's balance due to High Speed Capital was $14,000.00.

### 1.6.3 **Priority Wage Claims**

Due to Chippewa's sweep of the funds in Graceway's DACA account and its failure to release funds sufficient to cover payroll, Graceway's was unable to meet all of its pre-Petition payroll obligations. Graceway did not make its payroll for the pay periods ending May 9, 2021 and May 23, 2021. Payroll obligations in the amount of $125,912.49 were unpaid as of the Petition Date. In the event the ERC funds are not issued prior to the Effective Date, the accounts receivable on deposit in the Graceway DIP account will be surcharged

under Section 506(c) of the Bankruptcy Code to satisfy the priority wage claims. In the event the ERC funds are issued prior to the Effective Date, the priority wage claims will be paid from the ERC funds.

### 1.6.4  Priority Tax Claims

After the Petition Date, Graceway did not file and satisfy all of the payroll tax obligations associated with the payroll processed by Paycor. The Debtors estimate that Graceway's unpaid employment taxes are as follows: (1) federal employment tax obligations in the total amount of $800,086; (2) State of Michigan withholding tax liabilities due to the Department of Treasury in the total amount of $208,800; and (3) unemployment contributions due to the Unemployment Insurance Agency in the total amount of $110,000. Graceway's unpaid employment tax obligations, including the interest on the taxes, constitute priority claims against Graceway. The unpaid penalties and interest on the penalties associated with the unpaid employment taxes are a general unsecured claim against Graceway.

In addition to the employment tax liabilities, Graceway has an unpaid liability due to the Michigan Department of Health and Human Services ("MIHHS") in connection with its unpaid bed tax in the total

approximate amount of $800,000. The liability due MIHHS is a priority claim under Section 507(a)(8)(E) of the Bankruptcy Code.

### 1.6.5  Unsecured Debt

The Debtors' unsecured claims are comprised of the Debtors' trade claims due to vendors. Many of the claims arose prior to the pandemic and unfortunately remained unpaid when the Debtors were unable to recover after the shutdown and were unsuccessful in their efforts to sell Graceway's business as a going concern.

### 1.6.6  Guaranteed Debt

Graceway guaranteed Silverside's debts incurred in connection with the operation of Graceway's skilled nursing facility. The Debtors have not guaranteed the obligations of any third parties.

### 1.7  Current and Historical Financial Conditions

The Debtors' accounting was not complete on the Petition Date. The Debtors and their accountants have worked diligently to complete the accounting for the period January 1, 2019 through the end of Graceway's operations on May 31, 2021. The financial records prepared by the Debtors' accountants are believed to be reliable. However, the Debtors continue to complete missing information and to verify the accounting records. A summary of the Debtors' financial data for period January 1, 2019 through May 31, 2021 is attached hereto as **Exhibit A**. A

summary of the post-confirmation costs associated with the final wind down of the Debtors is attached as **Exhibit B**.

The Debtors did not conduct any post-petition operations. However, the Debtors continued to collect on accounts receivable and have received preference payments for the benefit of their creditors. The Debtors filed monthly operating reports reflecting post-petition income. The Debtors' Operating Statements for each month post-petition attached as **Exhibit C.** A summary of Debtors' Post-Petition Income as reported on the post-petition operating reports is attached as **Exhibit D**.

### 1.8  Significant Events During the Bankruptcy Case

### 1.8.1  Cash Collateral

The Debtors have had no active operations since May 27, 2021 when all residents were moved with the assistance of LARA to alternative facilities. Consequently, it was not necessary for the Debtors to use cash collateral post-petition. All collections of the Debtors' accounts receivable have been deposited into the Graceway Debtor in Possession account maintained at Pinnacle Bank.

### 1.8.2  Joint Administration

Due to the close relationship between Silverside and Graceway, the Debtors filed a First Day Motion for Entry of an Order Directing the Joint Administration of the Silverside Case and the Graceway Case [Docket Nos. 12 and 23]. On June

27, 2021, the Court entered an Order Authorizing the Joint Administration of Related Chapter 11, Subchapter V Cases [Docket No. 28]. On July 12, 2021, the Court entered an Amended Order Authorizing Joint Administration of Related Chapter 11, Subchapter V Cases [Docket No. 54] to address the joint matrix to be maintained on behalf of the Debtors.

### 1.8.3 Lifecycle Management of Clinical Information Trust Agreement with MetalQuest, Inc.

In the ordinary course of its operations, Graceway maintained records relating to its residents subject to the protections of the Health Insurance Portability and Accountability Act ("HIPAA"), including certain personal health information, electronic protected health information and business records (the "HIPAA Records"). In order to provide that the HIPAA Records were adequately protected and to ensure that they were in compliance with the requirements of HIPAA, the HIPAA Privacy and Security Rules and Michigan State law, including Michigan Record Retention Requirements, the Debtors filed a Motion for Entry of an Order Authorizing Graceway to Enter Into A Lifecycle Management of Clinical Information Trust Agreement with MetalQuest, Inc. (the "Records Retention Motion") [Docket No. 76]. As of the filing of this Plan, the Records Retention Motion remains pending with the Court. It is anticipated that there will be no objections to the Records Retention Motion and that the Court will enter an order

authorizing Graceway to enter into an agreement with MetalQuest providing for the protection of the HIPAA Records.

### 1.8.4 Employee Retention Credit

Upon the completion of Debtors' accounting it was determined that Graceway is eligible for funds under the Employee Retention Credit ("ERC") program of the CARES Act. The ERC is a refundable tax credit that can be either taken as a credit against future Form 941 liability or as a cash refund. The credit is subject to approval by the Department of Treasury. The applications for the ERC and the approval will all occur post-petition. Therefore, the revenue generated by the ERC is a post-petition asset. The Debtors have estimated that they are eligible for an ERC in the approximate amount of $650,000.00.

The application for forgiveness of the PPP loans must be completed before the Graceway is able to submit its request for ERC funds. However, based on Graceway's level of payroll it is anticipated that Graceway will be eligible for the ERC in 2020 and for the first quarter of 2021. Graceway has estimated that it is eligible for approximately $650,000 in ERC funds and potentially significantly more. The ERC shall first be used to satisfy the Group I and Group II claims to the extent such claims remain unpaid at the time the ERC funds are disbursed to Graceway and shall not be used for any other purposes, including any offset, without approval of the Bankruptcy Court. The ERC is a post-petition asset and

15

the Debtors have granted Chippewa a first secured interest against the ERC subject to the carveout for Group I and Group II.

### 1.8.5  Rejection and Termination of Chippewa Lease

On July 22, 2021, Chippewa filed a Motion to Compel Payment of Post-Petition Lease Obligations or, Alternatively, to Reject Lease [Docket No. 60] (the "Motion to Compel"). On August 12, 2021, pursuant to an agreement extending the response date, the Debtors filed a Response to the Motion to Compel [Docket No. 70] and on August 26, 2021, Chippewa filed its Reply to the Debtors' Response [Docket No. 82]. The Court scheduled a hearing on the Motion to Compel for September 3, 2021. Prior to the hearing, Chippewa and the Debtors reached a settlement regarding the rejection and termination of the lease. In exchange for an agreement to terminate the lease and grant a voluntary post-petition security interest in the ERC, Chippewa agreed to a carveout for the Group I and Group II claims to the extent such claims are not satisfied at the time the ERC funds are issued to Graceway and Chippewa agreed to forego a claim that the ERC is a pre-petition asset.

### 1.8.6  Completion of Accounting and Preparation of Tax Returns

Due to cash shortages and pressures from COVID-19, on the Petition Date, the Debtors' accounting dating to 2019 had not been completed. In addition, a number of tax returns, including several state and federal employment tax returns

as well as the Silverside partnership returns, had not been prepared and filed. As of the filing of this Plan, the accounting has been completed in a fashion that will allow the filing of all missing returns. The federal returns have been completed and submitted to the Internal Revenue Service for processing. The State of Michigan, Department of Treasury returns are in process and will be filed prior to confirmation. The information needed to complete the unemployment contribution reports has been prepared and submitted to the Unemployment Insurance Agency. Completing the accounting and preparing the tax returns has been a monumental task that has taken hours of time from the Debtors' accountants and insiders to complete.

### 1.8.7  Payroll Protection Program Loans and HHS Stimulus Funds

Prior to the Petition Date, Graceway received two Payroll Protection Program ("PPP") loans. In August, 2020, Graceway received $497,425 and an additional $497,425 on March 10, 2021 in PPP funds. Fifth Third served as a processing bank for the PPP Loans. Although the forgiveness applications have not yet been submitted, it is anticipated that both loans will be forgiven in full. Now that the Debtors' accounting has been completed and the employment tax returns submitted, the Debtors will be submitting the forgiveness applications prior to the Effective Date.

Graceway also received approximately $600,000 in Health and Human Services stimulus funds during 2020 (the "HHS Stimulus"). Although the HHS Stimulus does not require repayment, it does require Graceway to report to HHS to ensure the funds have been used for allowable purposes. The Debtors will complete the necessary reporting prior to the Effective Date.

### 1.8.8  Rejection of License

The Debtors have agreed with LARA and Bureau of Community and Health Systems (BCHS) to reject License No. 1070000074 used in connection with its 93 bed CON.

### 1.9.  Projected Recovery of Avoidance Actions

### 1.9.1  Preference Claims

The Debtors anticipate that in excess of $200,000 may be realized from the recovery of preferential transfers under Section 547 of the Bankruptcy Code for the benefit of the Debtors' estates and creditors. The Debtors have identified and are working to resolve the following potential preference claims as follows:

| Preference Party | Potential Preference Demand | Defenses Presented | Potential Preference | Settlement Amount | Settlement Approved |
|---|---|---|---|---|---|
| Carelinc | $12,715.00 | | | | |
| Concept Rehab | $34,942.92 | None Raised | $34,942.92 | $34,942.92 | Paid in full |
| DeBest Landscape | $7,732.09 | $912.00 payment to court officer | $6,820.00 | $3,400.00 | Pending |
| Jeremiah DeWitt | $14,000.00 | | | | |
| Gordon Foods | $15,846.50 | Ordinary Course New Value | | | |
| Granview Healthcare, LLC | $20,603.84 | | | | |
| Pathway Health Services | $7,500.00 | | | | |
| Point Click Care | $37,336.93 | | | | |
| Professional Medical | $30,284.59 | New Value Ordinary Course | $11,237.08 | $7,500.00 | |
| SNF Receivable Solutions | $46,318.33 | | | | |
| South Haven Utility Service | $45,187.85 | New Value Ordinary Course Section 547(j) | | | |
| South Haven Area Water and Sewer Authority | $29,993.97 | | | | |
| Nicolas Guibert deBruet | $24,500.00 | Ordinary Course New value | | | |
| | $326,962.02 | | | | |

All other payments made to creditors during the 90 days prior to the Petition Date were ordinary course payments, prepayments or subject to the new value exception.

### 1.9.2 Insider Transactions

The Debtors' insiders consist of Anthony B. Fischer, Jr., Nicolas Guibert deBruet, Mark Prifogle, Airmed Capital, LLC, SSC Holdings, LLC and Sajad Zalzala (collectively, the "Insiders"). During the twelve months prior to the Petition Date, other than the distributions set forth above, the distributions made to the Insiders were ordinary course compensation payments.

## ARTICLE II
## SUMMARY OF THE PLAN

This Plan of Liquidation proposes to pay the Debtors' creditors from the remaining collection of Graceway's accounts receivable, the recovery from the Avoidance Actions and proceeds from the ERC. The Plan establishes three (3) groups and six (6) classes of claims. The Plan provides for full payment in cash of (a) the administrative expenses for Debtors' professionals, the Subchapter V Trustee and the Health Care Ombudsman, (b) the priority wage claims; and (c) the allowed administrative claims of Chippewa Valley ((a), (b) and (c), collectively "Group Claims").

The Debtors' unsecured creditors, including the deficiency claims of the Debtors' secured creditors, shall receive a distribution of the proceeds that are available after payment in cash and in full of the Group Claims. The Debtors do not anticipate that there will be funds available for a distribution to the unsecured creditors. The Debtors' Insiders and equity security holders will receive no recovery under this Plan and shall, upon confirmation of the Plan, surrender their equity interests.

All creditors and equity security holders should refer to Articles I through V of this Plan for information regarding the precise treatment of their respective claims and interests. Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)

### ARTICLE III
### CLASSIFICATION OF CLAIMS AND INTERESTS

**3.1** **Unimpaired Interests**

**3.1.1** **Group I:** Group I shall consist of administrative claims due to the Debtors' professionals, including Debtors' counsel, Debtors' accountants, Debtors' special healthcare counsel, the Subchapter V Trustee and the Health Care Ombudsman. The allowed professional fees incurred during the Chapter 11 proceeding shall be paid in full, in cash, on the entry of an order approving such

fees or as soon thereafter as funds become available. The Group I claims shall be paid from a carveout in the ERC funds. In the event the ERC funds are not issued prior to Court approval of the Group I claims, the Group I claims shall be paid from the preference funds on deposit in the Graceway DIP account and to the extent necessary from a surcharge on the Debtors' account receivables on deposit in the Graceway DIP account.

**3.1.2 <u>Group II</u>:** Group II shall consist of the pre-petition priority wage claims of the Debtors' employees. The Group II claims shall be paid in full on or before the Effective Date or as soon there after as funds are available from the first available funds in the Debtors' estates. The Group II claims will be paid from a carveout in the ERC funds. In the event the ERC funds are not issued prior to the Effective Date, the accounts receivable on deposit in the Graceway DIP account will be surcharged under Section 506(c) of the Bankruptcy Code to satisfy the priority wage claims and to the extent necessary from the preference funds on deposit in the Graceway DIP Account.

**3.1.3 <u>Group III</u>:** Group III consists of the allowed administrative rent claim of Chippewa Valley, to the extent such exists. The Group III claim, to the extent Chippewa is awarded an administrative claim, shall be paid from the funds on deposit in the Graceway DIP account after the Group I and Group II claims are paid in full.

**3.2     Impaired Classes**

**3.2.1  Class I:**   Class I shall consist of the secured claim of McKesson Corporation.   The Class I claim of McKesson shall be paid in full from the Debtors' collection on its accounts receivable after the payment of the Group I and Group II claims.

Class I is impaired.

**3.2.2  Class II:**  Class II shall consist of the secured claim of High Speed Capital LLC.  The Class II claim of High Speed Capital LLC shall be paid in full from the collection of the Debtors' accounts receivable after the payment of the McKesson Class I claim in full.

Class II is impaired.

**3.2.3  Class III:**   Class III shall consist of the secured claim of Chippewa Valley, LLC.   The Class III claim of Chippewa will be paid in full from the proceeds of the ERC after the satisfaction of the carveout for the Group I professional fees and the Group II priority wage claims, to the extent the carveout is necessary to satisfy such claims, and from the Debtors' accounts receivable after the Class I McKesson claim and the Class II High Speed claim are paid in full.

Class III is impaired.

**3.2.4  Class IV:**   Class IV shall consist of the priority tax claims of the Internal Revenue Service, the State of Michigan, Department of Treasury, the State

of Michigan, Unemployment Insurance Agency and the State of Michigan, Department of Health and Human Services. The priority tax claims shall be paid on a pro-rata basis from the Debtors' accounts receivables, the preference funds, and the ERC funds to the extent available after the payment and satisfaction of Group I and II and Class I, II and III.

Class IV is impaired.

**3.2.5 <u>Class V</u>:** Class V shall consist of the allowed general Unsecured Claims of Creditors of the Debtors, other than the claims of the Debtors' insiders, to the extent such exist, including the Debtors' trade creditors, the deficiency claims of the Debtors' secured creditors and any penalty and interest on penalties due to the various taxing authorities. On the Petition Date, the Debtors' combined non-insider general unsecured trade debt totaled approximately $1,940,823.93. In addition, Healthteq's secured claim against Silverside in the amount of $459,415.04 is wholly unsecured due to the lack of collateral. The Department of Labor ("DOL") wage claim in the amount of $26,458.67 is a wholly unsecured due to the wage claims accruing outside the scope of Section 507(a)(4). The Debtors' have not estimated the value of the various taxing authorities' potential general unsecured claims for penalties and interest on penalties. In the event there are excess proceeds available from the collection of accounts receivable, the recovery of the ERC and the resolution of the Avoidance Action, after the payment of all

Group I, Group II and Group III Claims, if any, in full and in cash, the satisfaction of the Class I, Class II, Class III secured claims, and the payment of the Class IV priority tax claims and payment of the final wind down expense as set forth in **Exhibit B**, such proceeds will be distributed to the Class V Creditors on a pro-rata basis when funds become available. The Debtors do not anticipate that there will be any funds available for distribution to the Class V creditors.

Any Class V General Unsecured Claim that was identified as disputed, unliquidated or contingent in the Debtors' Schedules shall be deemed disallowed unless such Creditor holding a claim identified as disputed, unliquidated or contingent has timely filed a Proof of Claim.

The Class V is impaired.

**3.2.6 Class VI:** Class VI shall consist of the claims of the Debtors' insiders, including Mark Prifogle, Nicolas Guibert deBruet, Airmed Capital, LLC, Anthony Fischer, Jr., SSC Holdings, LLC and Sajad Zalzala. The Class VI claims shall include any claim for debt owed by the Debtors to the Class VI creditor and the equity interests of Class VI creditors. The Class VI debts interests shall be deemed cancelled as of the Effective Date of this Plan. The Class VI interests will receive no distribution under this Plan.

The Class VI is impaired.

The Debtors shall continue to exist as Michigan limited liability companies, as Liquidating Debtors, for the limited purposes of completing the obligations under this Plan.

Payments to be made pursuant to this Plan shall be from funds derived from the sources as set forth herein. All of the Debtors' disposable income, to the extent such exists, shall be distributed under this Plan.

The Debtors will not make any payments and will not incur any debts unless the debts and the payments comply with the terms and conditions of this Plan.

<h1 style="text-align:center">ARTICLE IV<br>EXECUTORY CONTRACT CLAIMS</h1>

All executory contracts of the Debtors shall be deemed rejected immediately upon confirmation of this Plan.

Any Creditor who has a Claim as a result of any rejected executory contract shall have thirty (30) days after the Confirmation Date to file a Proof of Claim, failing which such Claim shall be disallowed in its entirety.

The Debtors may file an objection to any Proof of Claim filed pursuant to this Article IV in accordance with Article XV.

<h1 style="text-align:center">ARTICLE V<br>FUNDING AND IMPLEMENTATION OF THE PLAN</h1>

**5.1** **Funding of the Plan**. Pursuant to Section 1190 of the Bankruptcy Code, the Debtors must show that it will have sufficient revenue to make the

payments required by the Plan. The Debtors are in the process of collecting on the outstanding accounts receivable and all such collections shall be deposited into the Graceway DIP account for disbursement under this Plan. On the Petition Date, the Debtors had no personal property that could be liquidated for the benefit of creditors. The Debtors have identified an ERC that they anticipate will generate revenue for the benefit of creditors and have pursued all available Avoidance Actions under the Bankruptcy Code. This Plan shall be funded through the proceeds of the collection of Graceway's accounts receivable, the recovery of an ERC and resolution of the Avoidance Actions. The Debtors reserve the right to amend the Plan.

Upon the Effective Date, unless otherwise released by the Plan, the Liquidating Debtors shall have, and is hereby assigned standing to pursue any and all Causes of Action, including Avoidance Actions, that have not been fully liquidated as of the Effective Date.

**5.2** **Termination of the Subchapter V Trustee**.

**5.2.1** If the Plan is confirmed under Section 1191(a) of the Bankruptcy Code, the Subchapter V Trustee shall continue to exercise powers and perform those duties specified in Section 1183 of the Bankruptcy Code through substantial consummation of the Plan at which point his services shall terminate.

**5.2.2** If the Plan is confirmed under Section 1191(b) of the Bankruptcy Code, the Subchapter V Trustee shall not be terminated until he has performed such duties as are described in Sections 1183 and 1194 of the Bankruptcy Code and such other duties as may be assigned by the Bankruptcy Court prior to the Effective Date.

**5.3.** __Post Confirmation Services to the Debtors__. Any services performed or expenses incurred by any professional on behalf of the Debtors or the Liquidating Debtors with respect to this Case after the Effective Date shall not be subject to the prior review and approval of the Court. All fees and expenses of the Liquidating Debtors arising after the Confirmation Date shall be billed directly to the Liquidating Debtors and shall be paid by the Liquidating Debtors in the ordinary course of business. The post-confirmation expenses are limited to the expenses set forth in the winddown budget set forth in **Exhibit B.**

The Debtors will remain responsible for the preparation and filing of the Forms 1065 for the tax year 2021. Therefore, the Debtors will incur additional expenses in order to properly complete this wind down. Debtors estimate additional fees and costs of approximately $10,000 to complete the tax return and the final accounting that will be required and to prepare and file any post-confirmation reports required by the US Trustee's office.

The routine costs the Debtors anticipates incurring through the wind down, anticipated through December 31, 2021, are attached as **Exhibit B .**

## ARTICLE VI
## <u>TAX CONSEQUENCES</u>

Debtors are unable at this time to fully determine the effect that the proposed Liquidating Plan will have upon their tax attributes. The Debtors are both limited liabilities treated as partnerships for tax purposes and therefore do not incur an income tax liability. Since the Debtors are liquidating and will be filing a final partnership tax return for the tax year 2021, any flow through issues and income tax implications from the discharge of any of its debt due to this bankruptcy proceeding will remain the responsibility of the members. Debtors recommend that the Creditors consult their tax specialist relative to the tax consequences of the Plan to the Creditors.

No ruling has been sought or obtained from the IRS with respect to any of the tax aspects of the proposed Plan and no opinion of counsel has been obtained by the Debtors with respect thereto. No representations or assurances are being made with respect to the federal income tax consequences as described herein. Certain types of claimants and interest holders may be subject to special rules not addressed in this summary of federal income tax consequences.

21-44887-lsg    Doc 91    Filed 09/07/21    Entered 09/07/21 17:14:31    Page 29 of 49

# ARTICLE VII
## DISCHARGE

**7.1**    **Discharge under 1191(a)**.  In the event this Plan is confirmed under Section 1191(a) of the Bankruptcy Code, except as otherwise explicitly provided in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims as of the Effective Date.  Except as otherwise provided in the Plan or the Confirmation Order, Confirmation shall, as of the Effective Date, discharge the Debtors from all Claims or other debts that arose before the Effective Date, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, and all debts of the kind specified in Bankruptcy Code Sections 502(g), 502(h) or 502(i), in each case whether or not a Proof of Claim is filed or deemed filed pursuant to Bankruptcy Code Section 501.

**7.2**    **Discharge under 1192(b)**.  In the event this Plan is confirmed under Section 1191(b) of the Bankruptcy Code, as soon as practicable after completion of the Debtors' Payments, the Court shall grant the Debtors a discharge of all debts provided in Section 1141(d)(1)(A) and allowed under Section 503 of the Bankruptcy Code (the "Discharge Order").  Notwithstanding the foregoing, the court shall not grant the Debtors a discharge of any debt of the kind specified in Section 523(a) of the Bankruptcy Code.

**7.3** **Effect of Discharge**.   Upon the Effective Date if the Plan is confirmed under Section 1191(a) or upon entry of a Discharge Order if the Plan is confirmed under Section 1191(b), and except as otherwise provided in the Plan or the Confirmation Order, all Persons and Entities shall be precluded from asserting against the Debtors, or their respective successors or property, any other or further Claims, demands, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.   In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all such Claims and other debts and liabilities against the Debtors pursuant to Bankruptcy Code Sections 524 and 1192, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged debt.

**ARTICLE VIII**
**CONSEQUENCES OF DENIAL OF CONFIRMATION OF PLAN**

If the Court fails to confirm the Plan, this Chapter 11 proceeding may continue, and the Debtors may seek confirmation of an amended or modified Plan. Alternatively, the Debtors' Chapter 11 case may be converted to a Chapter 7 liquidation case or this proceeding may be dismissed.

# ARTICLE IX
## VOTING AND RIGHT OF WITHDRAWAL

### 9.1    Voting Procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interests, which are impaired under the plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the plan.

Creditors that hold claims in more than one (1) impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a claim in more than one (1) class and who has not been provided with enough ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtors' Schedules of Assets and Liabilities other than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the

Court allowing such claim for voting purposes pursuant to Section 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the Debtors' attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtors' attorney.

**9.2** **Acceptance.**

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

**9.3  Withdrawal.**

Debtors reserve the right to withdraw, otherwise amend, or modify this Plan prior to confirmation.

# ARTICLE X
# DEFINITIONS

As used in this Plan, the following terms shall have the meanings specified below, unless the context requires otherwise:

**10.1** "Administrative Claim" means costs and expenses of administration of the Case allowed under §§503(b) and 507(a) (1) of the Bankruptcy Code, and the fees of the United States Trustee under 28 U.S.C. §1930(a) (6).

**10.2** "Administrative Creditor" shall mean any Creditor entitled to payment of an Administrative Expense.

**10.3** "Allowed Claim" or "Allowed Interest" means a Claim against or Interest in the Debtors to the extent that:

    A.    A Proof of Claim or Interest was:

        1.    Timely filed;

        2.    Deemed filed pursuant to §1111(a) of the Code; or

        3.    Filed late with leave of the Bankruptcy Court after notice and an opportunity for hearing given to Debtosr, and counsel for Debtors; and

    B.    The Claim is not a Contested Claim or a Contested Interest, or

C. The Claim is allowed (and only to the extent allowed) by a Final Order of the Bankruptcy Court.

**10.4** "Avoidance Actions" means all claims granted to the Debtors or Liquidating Debtors under sections 544-553 of the Code.

**10.5** "Ballot" shall mean the official Bankruptcy Form No. 14, or a document prepared to substantially conform to same being sent to all Creditors and parties-in-interest entitled to vote for or against the Plan.

**10.6** "Bankruptcy Code" or "Code" means the Bankruptcy Reform Act of 1978, as amended (11 U.S.C. §§101, et seq.).

**10.7** "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan and any court having jurisdiction over any appeals.

**10.8** "Bankruptcy Rules" or "Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court that became effective on August 1, 1991 and any amendments thereto. To the extent applicable, Bankruptcy Rules also refers to the Local Rules of the U.S. District Court for the Eastern District of Michigan, as amended and the Local Bankruptcy Rules for the Eastern District of Michigan, as amended.

**10.9** "Business Day" means any day, other than a Saturday, Sunday or "Legal Holiday," as that term is defined in Bankruptcy Rule 9006(a).

**10.10** "Case" or "Cases" means the cases currently pending before the United States Bankruptcy Court for the Eastern District of Michigan styled as *In re Silverside Senior Living, LLC* (Case No. 21-44887-lsg) and *Graceway South Haven, LLC* (Case No. 21-44888-lsg).

**10.11** "Chippewa" means Chippewa Valley, LLC an Illinois limited liability company.

**10.12** "Claim" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, contested, disputed, undisputed, legal, equitable, secured or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, contested, disputed, undisputed, secured or unsecured.

**10.13** "Class" means a class of holders of Claims or Interests described in Article III of this Plan.

**10.14** "Confirmation Date" means the date upon which the Bankruptcy Court shall enter the Confirmation Order.

**10.15** "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court with respect to the confirmation of the Plan.

**10.16** "Confirmation Order" means the order of the Bankruptcy Court, which confirms this Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

**10.17** "Contested Claim" means any Claim as to which Debtors or any other party in interest has interposed an objection or commenced an adversary proceeding in accordance with the Bankruptcy Code, Bankruptcy Rules and this Plan, which objection has not been determined by a Final Order.

**10.18** "Creditor" means any holder of a Claim against the Debtors.

**10.19** "Debtors" means Silverside Senior Living, LLC and Graceway South Haven, LLC.

**10.20** "Disbursing Agent" shall mean the Debtors.  If the Debtors are unable to serve, then the Disbursing Agent shall be an individual selected by the Debtors from the current panel of Chapter 7 Trustees maintained by the Office of the United States Trustee or an appropriate individual acceptable to the Debtors.

**10.21** "Effective Date" shall mean the sixtieth (60th) business day after the Confirmation Order becomes a Final Order.

**10.22** "Exculpated Claim" means any Claim arising after the Petition Date and prior to the Confirmation Date against the Debtors, the Liquidating Debtors, their officers, employees, agents or Professionals related to any act or omission in connection with, relating to this Chapter 11 Case, the filing of the Liquidating Plan

or any contract, instrument, release, or other agreement or document created or entered into in connection therewith, the filing of this Case, or any actions taken during the pendency of this Case or the administration or implementation of the Liquidating Plan or the distribution of property thereunder.

**10.23** "Final Order" means an Order of the Bankruptcy Court as to which (i) the time for appeal has expired and no appeal has been timely taken; or (ii) any timely appeal has been finally determined or dismissed; or (iii) an appeal has been timely taken, but such order has not been stayed within ten (10) days after the filing of such appeal.

**10.24** "Graceway" means Graceway South Haven, LLC, a Michigan limited liability company whose sole member is Silverside Senior Living, LLC.

**10.25** "Health Care Ombudsman" means Deborah Fish.

**10.26** "Holder" shall mean a Person holding a Claim, Interest, or Lien, as applicable, with respect to the Debtors.

**10.27** "Impaired" means a Claim treated under this Plan, unless the Plan:

(a)     leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest; or

(b)     Notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default—

(1)     cures any such default (other than defaults relating to (i) any penalty interest rate or provision arising from a non-monetary default

by the Debtors; (ii) the solvency or financial condition of the Debtors or (iii) the commencement of this Case) that occurred before or after the commencement of the Case;

(2)    Reinstates the maturity of such Claim or Interest, as such maturity existed before such default;

(3)    compensates the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; and

(4)    Does not otherwise alter the legal, equitable or contractual rights to which such Claim or Interest entitles its holder.

**10.28** "Insider" means each Anthony B. Fischer, Jr., Nicolas Guibert deBruet, Mark Prifogle, Airmed Capital Holdings, SSC Holdings, LLC and Sajad Zalzala.

**10.29** "Insiders" means, collectively, the Insiders.

**10.30** "Interest" means the interests of Debtors as defined in the Code.

**10.31** "Interest Rate" means (a) with respect to Claims entitled to interest under § 506 of the Bankruptcy Code and this Plan and having an applicable contractual rate of interest, the lowest rate of interest provided in such contract, without regard to any default by Debtors, (b) with respect to all other Claims entitled to interest under the Bankruptcy Code and this Plan, the Prime Rate of Interest as of the Confirmation Date, or (c) with respect to (a) or (b) such other interest rate as may be determined by a Final Order of the Bankruptcy Court.

**10.32** "Liquidating Debtors" shall mean Silverside Senior Living, LLC and Graceway South Haven, LLC, to the extent they continue to exist to implement the terms of this Plan after the Effective Date.

**10.33** "Petition Date" means the date the Debtors filed these jointly administered cases, which date is June 7, 2021.

**10.34** "Plan" or "Liquidating Plan" means this Liquidating Plan, as it may be altered, amended, modified or supplemented from time to time.

**10.35** "Priority Claim" means a Claim entitled to priority under any section of the Bankruptcy Code except claims specified in §507(a)(1) of the Code.

**10.36** "Priority Wage Claimants" shall mean the Debtors' former employees with claims for unpaid wages.

**10.37** "Professional Fees" means the fees and reimbursement for disbursements owed to attorneys, accountants, or other professionals of the Debtors whose employment has been approved by the Bankruptcy Court.

**10.38** "Secured Claim" shall mean a Claim secured by a lien on property in which the Estate has an interest but only to the extent of the value of the Creditor's interest in the Estate's interest in such property as of the Petition Date and only if such Secured claim is Allowed.

**10.39** "Silverside" means Silverside Senior Living, LLC, a Michigan limited liability company whose members are Airmed Capital Holdings (77%), SSC Holdings, LLC (10%), Mark Prifogle (10%) and Sajad Zalzala (3%).

**10.40** "Subchapter V Trustee" means Charles M. Mouranie.

**10.41** "Unsecured Claim" means a Claim that is not a Secured Claim and is not an Administrative Claim or a Priority Claim.

**10.42** "Unsecured Creditor" shall mean any Creditor that holds an Unsecured Claim.

**ARTICLE XI**
**EFFECT OF CONFIRMATION**

**11.1** Confirmation of the Plan shall modify and alter the rights of all Creditors and holders of Interests as provided herein on the Effective Date. Creditors or holders of Interests shall be prohibited from asserting any further claims against the property of the Debtors based upon any act, transaction or indebtedness which is the subject matter of any Claim or Interest, or based upon any guarantee of collection, payment or otherwise made by the Debtors as to any obligation of any persons, firm or entity, unless the Plan provides, or the Court specifically orders otherwise. On the Effective Date, the assets of the Debtors not otherwise transferred prior to the Effective Date, shall re-vest in the Liquidating Debtors.

**11.2**    Except as otherwise provided in the Plan, on the Effective Date no person that has acted for on behalf of the Debtors or the Liquidating Debtors shall have or incur, and is hereby released and exculpated from, any claim, obligation, cause of action or liability for any Exculpated Claim, except for gross negligence or willful misconduct.  The Debtors and Liquidating Debtors and their respective affiliates, agents, directors, members, shareholders, managers, officers, employees, advisors and attorneys, have and on the Effective Date shall be deemed to have, participated in compliance with the applicable provisions of the Bankruptcy Code and shall not be liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**11.3**    On and after the Effective Date, the Liquidating Debtors shall continue the wind down process in the ordinary course under the terms of this Plan and applicable non-bankruptcy law to the extent such wind down is not completed prior to the Effective Date.   The Debtors and Liquidating Debtors shall be authorized to incur the expenses as set forth in **Exhibit B** and as required to meet its non-bankruptcy law obligations.

**11.4**    Except as otherwise provided in the Plan, pursuant to the application provisions in the Bankruptcy Code, including, but not limited to, Section 553, and non-bankruptcy law or agreement of the parties, and except in the case of the

Group II Claim, Debtors and/or Liquidating Debtors may set-off against any Allowed Claim and distributions to be made with respect to such allowed Claim, any Claims, rights, and Causes of Action of any nature that the Debtor and/or Liquidating Debtor may hold against the Holder of such Allowed Claim or such Holders' predecessor-in-interest, as applicable, Claimant.

## ARTICLE XII
## MODIFICATION OF THE PLAN

**12.1**   After confirmation, the Debtors and Liquidating Debtors may, with leave of the Bankruptcy Court, and upon notice and opportunity for hearing to the affected Creditor(s) only, remedy any defect or omission, reconcile any inconsistencies in the Plan or in the Confirmation Order or otherwise modify the Plan.

**12.2**   Only if the Bankruptcy Court determines that the modification affects all the Creditors, or if the Debtors and Liquidating Debtors propose a material modification affecting all Creditors, shall such modification be governed by §1127 of the Bankruptcy Code.

# ARTICLE XIII
## JURISDICTION OF THE COURT

**13.1**  Notwithstanding confirmation of the Plan, the Bankruptcy Court shall

retain jurisdiction for the following purposes:

    A.    To determine all objections to the allowance of Claims;

    B.    To approve or disapprove any compromise by the Debtors of any Claim;

    C.    To determine all disputes arising under the Plan, including any dispute over any action taken by the Disbursing Agent, and to enforce, interpret and administer the terms and conditions of the Plan;

    D.    To determine any applications for allowance of compensation and reimbursement of expenses as may be required for pre-confirmation services;

    E.    To determine any applications for rejection, assumption, or assignment of executory contracts and the allowance of any claims resulting from the rejection thereof or from the rejection of executory contracts pursuant to the Plan;

    F.    To determine any applications, adversary proceedings, and contested and litigation matters pending in the Case at the Confirmation Date or thereafter filed;

    G.    To determine any applications on file for approval of settlement agreements and entering and enforcing all appropriate orders in connection therewith;

    H.    To modify any provisions of the Plan pursuant to the Rules, the Code and provisions of the Plan;

I.    To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

J.    To determine such other matters provided in the Confirmation Order as may, from time to time, be authorized under the provisions of the Code or any applicable law;

K.    To enforce all orders, judgments, injunctions, and rulings in connection with this proceeding; and

L.    To enter such orders that may be necessary or appropriate to aid in confirmation and to facilitate implementation of the Plan.

## ARTICLE XIV
## TITLE TO PROPERTY

**14.1** All property of the Debtors and Debtors in Possession not transferred prior to the Effective Date shall vest in the Liquidating Debtors on the Effective Date. The Debtors shall be discharged from its status as Debtors and Debtors in Possession and the affairs and business of the Debtors shall thereafter be conducted without Court involvement except as may be governed by Articles XII, XIII and XIV of this Plan.

## ARTICLE XV
## PROOFS OF CLAIMS/OBJECTIONS TO CLAIMS

**15.1** The Court set a deadline of October 7, 2021, as the bar date for non-governmental proofs of claim to be filed with the Court. Governmental units are to file proofs of claim one hundred eighty (180) days from the Petition Date. Except as otherwise set forth in this Plan as an Allowed Claim, the Debtors and

Liquidating Debtors may object to the allowance of any Claim, whether listed on the schedules filed by Debtors or filed by any Creditor, on or before the later of (a) sixty (60) days from the date of service of any Proof of Claim upon the Debtors or Liquidating Debtors, or, (b) sixty (60) days after the Effective Date.

## ARTICLE XVI
## DEFAULT

**16.1** Upon the failure of the Debtors or Liquidating Debtors to make any payment due under this Plan which is not cured within sixty (60) days of the mailing of a written notice of default by the Creditor, such Creditor may seek appropriate relief from this Court.

## ARTICLE XVII
## MISCELLANEOUS PROVISIONS

**17.1** Except as otherwise set forth in this Plan, the Debtors and Liquidating Debtors each have standing to pursue any and all Avoidance Actions on the behalf of creditors, to the extent such exist and it is in the Debtors' and the Liquidating Debtors' sound business judgment whether to pursue or waive such actions.

**17.2** Any Professional Fees incurred by any professional whose employment required the approval of the Bankruptcy Court during the pendency of the Case, shall from and after the Confirmation Date be paid by the Debtors and Liquidating Debtors without the prior review and approval of the Bankruptcy Court. Notwithstanding any provision of the Bankruptcy Code or Rules, including

without limitation Fed.R.Bank.Pro. 2016, after the Confirmation Date no professional shall be required to disclose payments received from the Debtors or Liquidating Debtors for services provided after the Confirmation Date. All fees and expenses arising after the Confirmation Date shall be billed directly to the Debtors and Liquidating Debtors and the Bankruptcy Court shall only review that portion to which the Debtors and Liquidating Debtors object prior to the closing of the cases. The Debtors and Liquidating Debtors shall pay, in accordance with the terms of any invoice with respect to such fees, the portion as to which there is no objection.

**17.3** Notwithstanding anything in this Plan to the contrary, the Debtors and Liquidating Debtors shall not be obligated to make any payments towards any Contested Claim. Further, the Debtors shall not be required to make any payments for an Allowed Claim to any Creditor if the Debtors have filed a motion, objection, adversary proceeding, state court proceeding or other similar notice against such Creditor before the Confirmation Date alleging an objection, claim, cause of action, offset or counter-claim, such that if sustained and not paid by such Creditor would result in a disallowance of such Allowed Claim in accordance with §502(d) of the Code.

**17.4.** All parties in interest, including without limitation any Creditor, shall be required to execute any document reasonably requested by the other to

memorialize and effectuate the terms and conditions of this Plan. This shall include without limitation any execution by Creditors of any UCC or mortgage terminations and releases.

**17.5.** When the Debtors, Liquidating Debtors or the Disbursing Agent have made all payments and met all obligations required under this Plan all restrictions, negative covenants and other limitations on the Debtors and Liquidating Debtors shall terminate.

**17.6.** Any lien or encumbrance of any Creditor, which is not specifically preserved by this Plan, shall, and hereby on the Effective Date is, extinguished, released and terminated. Any Creditor holding such a lien or encumbrance shall be required to execute any document reasonably requested by the Debtors and Liquidating Debtors to memorialize said termination. If a Creditor fails to cooperate with the Debtors, the Debtors may seek to enforce this provision within the Bankruptcy Court or, at the Debtors' or Liquidating Debtors' option, the Debtors may file a certified copy of the Confirmation Order and a copy of this Plan with the appropriate register of deeds or Secretary of State's office and the filing of the certified Confirmation Order and this Plan shall serve to terminate such lien or encumbrance.

**17.7.** This Plan and the Confirmation Order shall inure to the benefit of, and be binding upon, all parties in interest and their respective successors and assigns.

**SILVERSIDE SENIOR LIVING, LLC,** a
Michigan limited liability company

By:    /s/  Anthony B. Fischer, Jr.
        Anthony B. Fischer, Jr.
Its:   CEO

**GRACEWAY SOUTH HAVEN, LLC,** a
Michigan limited liability company

By:    /s/  Anthony B. Fischer, Jr.
        Anthony B. Fischer, Jr.
Its:   CEO

**STROBL SHARP PLLC**

*/s/    Lynn M. Brimer*
LYNN M. BRIMER (P43291)
PAMELA S. RITTER (P47886)
Strobl Sharp PLLC
Attorneys for Debtors
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI 48304-2376
Telephone: (248) 540-2300
Facsimile: (248) 645-2690
E-Mail: lbrimer@strobllaw.com
        pritter@strobllaw.com

Dated: September 7, 2021

*S&B\85370\002\BANKRUPT\SB758270.DOC