# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

**SILVERSIDE SENIOR LIVING, LLC, et al.,**[1]

      Debtors.

_____/

Case No. 21-44887
Chapter 11
Hon. Lisa S. Gretchko

Jointly Administered

## DEBTORS' SECOND AMENDED PLAN OF LIQUIDATION

## INTRODUCTION

Silverside Senior Living, LLC ("Silverside") and Graceway South Haven, LLC ("Graceway"), as Debtors and Debtors in Possession in the above-styled case (collectively, the "Debtors"), by and through their attorneys, Strobl Sharp PLLC, propose the following Second Amended Plan of Liquidation (the "Plan" or "Liquidating Plan") pursuant to 11 U.S.C. §§ 1190 and 1191. The Plan is presented to you to inform you of the proposed distribution of the Debtors' assets and to seek your vote to accept the Plan.

As a Creditor, your acceptance of this Plan is extremely important to the Debtors. You are encouraged to carefully review the full text of this Plan, including all exhibits and attachments, before deciding how to vote on the Plan.

---

[1] The debtors in these jointly administered proceedings along with the last four digits of their respective federal tax id numbers are Silverside Senior Living, LLC (2357) [Case No. 21-44887-lsg] and Graceway South Haven, LLC (9393) [Case No. 21-44888-lsg].

In addition to casting your vote to accept or reject the Plan, you may object to confirmation of the Plan. If you wish to object, you must do so by November 21, 2022. Your ballot stating how you are voting on the Plan must be returned so that it is received by November 21, 2022. The ballot must be forwarded to Lynn M. Brimer by either mailing such ballot to the following address: Lynn M. Brimer, Strobl Sharp PLLC, 300 E. Long Lake Road, Ste. 200, Bloomfield Hills, Michigan 48304; or emailing the ballot to lbrimer@strobllaw.com.

An in-person hearing on confirmation of the Plan is scheduled for December 2, 2022, at 1:00 p.m., before the Honorable Lisa S. Gretchko, in Courtroom 1975, 211 West Fort Street, Detroit, Michigan 48226. Your rights may be affected by this Plan. You should consider discussing the Plan with an attorney.

## ARTICLE I
## HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTORS

### 1.1 Nature of the Debtors' Businesses

Prior to the Petition Date, Graceway operated a skilled nursing facility located in South Haven, Michigan. On the Petition Date, Graceway maintained a Certificate of Need ("CON") issued by the State of Michigan, Department of Health and Human Services for a 93-bed facility. Silverside is Graceway's sole member. Silverside was originally established as a management company to own and oversee the management and administration of skilled nursing facilities.

2

Graceway was the first and only facility Silverside acquired. It began providing management services to Graceway in 2019. However, by 2020, Graceway was directly managing its own operations and Silverside has had no active operations since mid-2020.

### 1.2 History of the Business Operations of the Debtors

Silverside, a Michigan limited liability company, was originally organized in March 2018 as ACM Senior Living, LLC ("ACM"). Its members are Airmed Capital Holdings (77.0%), SSC Holdings, LLC (10%), Mark Prifogle (10%), and Sajad Zalzala (3%). In February 2019, ACM changed its name to Silverside Senior Living, LLC. ACM was formed with the intent of acquiring skilled nursing facilities throughout the State of Michigan through independent limited liability companies.

On September 6, 2018, Silverside organized Graceway to operate a skilled nursing facility in South Haven, Michigan. On October 31, 2018, Silverside entered into a twenty-year lease with Chippewa Valley, LLC, an Illinois limited liability company ("Chippewa"), for the property located at 120 Baseline Road, South Haven, Michigan (the "Baseline Property") (the "Chippewa Lease"), with the intent of assuming the operations of the skilled nursing facility known as Countryside Nursing and Rehabilitation Community (the "Countryside SNF")

3

from the then tenant of that location, Atrium Centers, Inc. ("Atrium"). Graceway was the agreed subtenant under the Chippewa Lease.

In January 2019, Atrium continued operations and began the transition to Graceway. Graceway was awarded Countryside SNF's 93-bed CON by the State of Michigan and in February 2019 assumed Countryside SNF's operations independent of Atrium.

### 1.3     <u>Events Leading to the Filing of the Debtors' Chapter 11 Case</u>

A number of factors contributed to the financial condition of the Debtors necessitating the filing of these Chapter 11 cases. Unfortunately, the licensing process after Graceway assumed responsibility for Countryside SNF's operations took much longer than anticipated. The Medicaid license was not issued until November 2019, more than eight (8) months after Graceway assumed operations. As a result, Graceway was compelled to borrow funds from multiple sources, including Atrium and various accounts receivable factoring companies, to bridge the revenue gap while waiting for reimbursement revenue. By late 2019, Graceway's license was issued and it began receiving reimbursements under Medicare.

As census numbers trended upwards and revenue improved, Graceway no longer needed the support of the factoring companies. However, in order to ensure sufficient cash flow to support growth, on March 23, 2020, the Debtors entered

into a Credit Agreement with Chippewa for a revolving line of credit based on a borrowing base formula with an initial credit limit of $500,000.00 (the "Line of Credit") and a maturity date of March 22, 2021. The Credit Agreement required the Debtors to establish a lockbox account with Fifth Third Bank ("Fifth Third") for the deposit of the Graceway receivables. On April 10, 2020, Silverside and Graceway each entered into a Deposit Account Control Agreement (DACA) with Fifth Third and Chippewa. As receivables were deposited into the DACA account, Chippewa swept the account and advanced new funds to the Debtors under the Line of Credit. Consequently, once the DACA and Line of Credit were in place, all cash disbursements were made with funds advanced by Chippewa.

Contemporaneous with Chippewa's demand for the DACA accounts, COVID-19 hit Michigan, taking a significant toll on the skilled nursing home industry in general and Graceway in particular. In late spring 2020 Graceway was hit by a COVID-19 outbreak, causing further financial stress for the operations. Chippewa increased the line of credit to $750,000.00 in order to ensure adequate availability to cover expenses.

By late 2020, the loss of census due to the impact of COVID-19, caused Graceway to seek alternative avenues for funding, including a potential sale of its CON and the assignment of the Chippewa Lease to a new operator. Under pressure from Chippewa to transition the CON, the Chippewa Lease and the Countryside

SNF's operations to a Chippewa preferred purchaser, Graceway began marketing its operations to determine if there was a viable purchaser willing to buy directly from the Debtors for the benefit of the Debtors' creditors.

The Debtors received a number of inquiries and several parties exhibited an interest in investigating the possibility of the transaction. However, due in part to Graceway's unpaid Michigan bed tax and significant secured debt, no purchaser was willing to extend a firm offer for Graceway's assets.

By May 2021, Graceway's cash flow difficulties became even more severe. Graceway defaulted on its obligations to Chippewa and consequently Chippewa was unwilling to release new funds to Graceway. Graceway was unable to meet its payroll obligations and by late May 2021, the State of Michigan, Department of Licensing and Regulatory Affairs ("LARA") began working with Graceway to ensure the health and safety of its residents. On May 27, 2021, with the assistance of LARA, Graceway moved all of its residents to alternative facilities.

Left with no residents or source of revenue, the Debtors had no option but to file for bankruptcy protection in order to trigger the protections needed to complete the Debtors' accounting, prepare and file tax returns, marshall and liquidate the Debtors' assets, including accounts receivable, for the benefit of creditors and complete an orderly winddown of the entities.

### 1.4    Legal Structure of the Ownership of the Debtors

Silverside, a Michigan limited liability company, was originally organized in March 2018 as ACM Senior Living, LLC ("ACM"). Its members were Airmed Capital Holdings (77.0%), SSC Holdings, LLC (10%), Mark Prifogle (10%) and Sajad Zalzala (3%). Graceway is a Michigan limited liability company. Silverside is its sole member.

### 1.5    Debtors' Assets/Liquidation Analysis

### 1.5.1    Pre-Petition Assets

In order to evaluate the Plan, Creditors must consider the liquidation analysis of the Debtors' assets. On the Petition Date, Silverside's sole asset was its interest in Graceway. Graceway owned personal property assets consisting of the following:

    a.  Furniture and equipment used in the operation of its business;
    b.  Leasehold interest in the Baseline Property;
    c.  Accounts receivable; and
    d.  Certificate of Need.

Some of the personal property located at the facility used in the operation of Graceway's business was owned by Chippewa. Pursuant to paragraph 6.3 of the Chippewa Lease, upon the termination of the lease, the personal property within the facility likewise became the property of Chippewa. In an effort to monetize Graceway's personal property for the benefit of the bankruptcy estates, Debtors

7

contacted several auctioneers post-Petition, including an auctioneer specializing in medical and healthcare assets. However, due to its *de minimis* value and poor condition and the costs associated with removing and storing the personal property, the Debtors elected to surrender the Graceway-owned personal property to Chippewa in conjunction with the termination of the Chippewa Lease.

In addition, after Graceway's reconciliation of the resident funds on deposit, there were excess funds available for credit against accounts receivable in the amount of $6,475.15.

### 1.5.2 Graceway's Accounts Receivable

On the Petition Date, Graceway estimated that its collectable accounts receivable had a value of approximately $250,000.00. In the ordinary course of winding down its operations, Graceway engaged a billing company, Varipro, to assist with collection of the remaining accounts receivable. After the involvement of Varipro, Graceway initially estimated that as of the Petition Date the collectable accounts receivable had a value of approximately $718,302.09, excluding Medicare and Medicaid claims. However, due to deficiencies with coding and billing procedures after the onset of COVID-19, collection and settlement on the accounts receivable reflected in Graceway's billing system was limited. As of the filing of this Plan, Graceway has resolved all outstanding collectable accounts receivable either through payment on claims or through settlements as follows:

| Insurance Carrier | Initial Projected Recovery | Collection on Claims | Settlement Amount |
|---|---|---|---|
| Aetna | $173,045.00 | | $23,585.00 |
| Blue Cross Blue Shield | $112,247.42 | $46,110.37 | |
| Meridian | $217,607.83 | $12,989.65 | |
| Priority Health | $152,731.72 | | $63,600.00 |
| Collected Private Pay | | $9,656.60 | |
| Spectrum Health | | $21,213.52 | |
| Hospice Care | | $11,826.08 | |
| One America | | $59.32 | |
| Curo Hospice | | $5,858.79 | |
| TOTAL: | | $107,204.53 | $87,185.00 |

Graceway has collected on the claims. The settlement have been approved by the Court and the payments received by Graceway. The amounts collected have been deposited into the debtor-in-possession checking account at Pinnacle Bank.

The Debtors' liquidation analysis is attached as **Exhibit E**.

### 1.5.3  **Medicare Claims**

Varipro submitted substantial claims to Medicare totaling approximately $1,156,849.26. However, the Center for Medicare Services ("CMS") was not able to process the claims due to deficient coding.

The United States filed two claims on behalf of the Department of Health and Human Services. CMS filed a proof of claim asserting a general unsecured claim in the amount of $782,824.33 [Claim No. 28] based on the following:

a. $16,388.24 in account receivable debt;
b. $502,670.39 for recoupment of all 2020 payments made to Graceway due to the lack of the cost report having been filed;  and
c. $263,765.70 for payments received under the Coronvirus-19 Accelerated and Advanced Payments (the "CAAP Funds") program.

In addition, the Health Resources & Services Administration ("HRSA") filed a proof of claim in the amount of $578,806.68 [Claim No. 29] based on Provider Relief Funds ("PRF") received by Graceway. The claim is based on the reported failure of Graceway to timely complete all reporting requirements with respect to the PRF it has received. Graceway has completed all required reports due in connection with the PRF funds it has received. The reports confirm that Graceway was fully compliant in its use of the PRF funds. The Debtor has been advised that the HSRA claim will be amended to reflect a balance due of $0.02.

### 1.5.4  Employee Retention Credit

Upon the completion of Debtors' accounting, it was determined that Graceway is eligible for relief under the Employee Retention Credit ("ERC") program of the CARES Act. The ERC is a refundable tax credit that can be either taken as a credit against future Form 941 liability or as a cash refund. The credit is subject to approval by the Department of Treasury.

On December 10, 2021, Graceway submitted its ERC application (the "ERC Application") pursuant to Section 505 of the Bankruptcy Code, Revenue Procedure 2010-27, as Modified by Announcement 2011-77 and IRS Publication 908, Bankruptcy Tax Guide (2021) (collectively the "Prompt Review Procedures"), seeking a refundable credit for the fourth quarter of 2020 and first quarter of 2021 in the total amount of $427,371.24 (collectively, the "Initial ERC Claim").  In May 2022, it was also determined that Graceway was also eligible for an ERC for the second quarter 2021 in the amount of $156,947.58 (the "Second ERC Claim")(collectively, the Initial ERC Claim and the Second ERC Claim shall be referred to as the "ERC Claims").

In about June 2022, the Initial ERC Claim was assigned to an agent in the IRS Prompt Determination Unit. The Second ERC Claim was submitted directly to the agent assigned to the Initial ERC Claim for consolidated review.  Due to the dollar amount of refunds reflected in the ERC Claims, review by the examination

division of the IRS was required. In late August, counsel for the Debtors was contacted by the agent conducting the audit of the ERC Claims. An Information Document Request ("IDR") was issued seeking the supporting payroll and other financial records supporting the ERC Claims. The audit was completed and the final audit reports were issued on September 30, 2022. The IRS has approved the ERC Claims as follows:

1. 4th quarter 2020:      $240,207.34;

2. 1st quarter 2021:      $235,596.55; and

3. 2nd quarter 2021:      $156,947.58.

The Debtor has reached a settlement with the the Internal Revenue Service and Chippewa regarding the treatment of the ERC Claims. The Parties have agreed that the ERC refund claims for the 4th quarter 2020 and 1st quarter 2021 are prepetition assets and the ERC refund claim for the 2nd quarter 2021 is post-petition claim. The full settlements regarding treatment of the ERC refund claims is set forth below in paragraphs 1.10.1 and 1.10.2.

### 1.6    Debtors' Liabilities

### 1.6.1  Chippewa Debt

Chippewa holds claims against the Debtors for the balance due in connection with the Credit Agreement, the unpaid pre-petition rent and the Chippewa Lease obligations. Chippewa has filed a UCC-1 Financing Statements against both

Silverside and Graceway. The Chippewa UCC-1 Financing Statement filed against Silverside on February 5, 2019 is junior to the UCC-1 Financing Statement filed by Healthteq Services, LLC ("Healthteq") on February 4, 2019. However, as of the Petition Date, Silverside has no assets, other than its interest in Graceway, to secure the claims of Healthteq or Chippewa. Consequently, any secured claims against Silverside asserted by either Healthteq or Chippewa have no value.

Chippewa filed two (2) UCC-1 Financing Statements against Graceway on March 24, 2020 and April 3, 2020. The Chippewa secured claim against Graceway is junior to the claim of McKesson Corporation which filed its UCC-1 Financing Statement on January 18, 2019 and the claim of High Speed Capital LLC ("High Speed") which filed its UCC-1 Financing Statement on January 7, 2020.

The Debtors agreed to grant Chippewa a post-petition security interest in the Initial ERC. However, the IRS has asserted set off rights with respect to the Initial ERC Claim. The Debtors, IRS, and Chippewa have subsequently agreed that the Initial ERC Claim is a prepetition asset subject to IRS set off rights and that the Second ERC Claim for the 2nd quarter 2021 is a post-petition asset subject to the post-petition security interest of Chippewa.

Chippewa filed a prepetition proof of claim reflecting a secured claim in the amount of $668,189.00 [Claim No. 21-1]. In addition, on November 21, 2022, the

Court entered an Order Granting Chippewa Valley, LLC an Administrative Expense Pursuant to 11 U.S.C. §§ 365(d)(3) and 503(b)(1)(A) awarding Chippewa Valley an administrative expense in the amount of $107,339.10 [ECF No. 158]. Chippewa's total claim against the Debtors' estates is $775,528.10.

As set forth below, Chippewa has agreed to a distribution from the Debtors' estates in the total amount of $300,000.00. The complete terms of the settlement regarding the ERC Claims and the distribution to Chippewa is set forth below in paragraphs 1.10.2 and 3.2.3.

### 1.6.2 McKesson Corporation

McKesson Corporation filed a UCC-1 Financing Statement on January 18, 2019. McKesson Corporation is the first secured creditor in Graceway's prepetition assets. Graceway's books and records indicate that on the Petition Date, Graceway's balance due to McKesson was $42,452.65. McKesson has filed a proof claim in the amount of $51,709.52.

### 1.6.3 High Speed Capital LLC

High Speed Capital LLC ("High Speed") filed a UCC-1 Financing Statement against Graceway on January 7, 2020 in connection with receivables financing extended to Graceway. High Speed holds an all-asset lien against Graceway's prepetition assets. On the Petition Date, Graceway's books and

records reflect a balance due to High Speed was $14,000.00. High Speed has not filed a proof of claim.

### 1.6.4  Priority Wage Claims

Due to the lack of available cash, Graceway was unable to meet all of its pre-Petition payroll obligations. Graceway did not make its payroll for the pay periods ending May 9, 2021 and May 23, 2021. Total payroll obligations in the approximate amount of $82,595.47 were unpaid as of the Petition Date (the "Priority Wage Claims").

The Priority Wage Claims will be paid from a carveout from the Initial ERC Claim agreed to by the IRS.

The US Department of Labor ("DOL") has filed a priority claim in the amount of $26,458.27 in connection with wage claims for alleged unpaid overtime time wages. Prior to the Petition Date, Graceway disputed the overtime claims. All of the wages reflected in the DOL are outside of the scope of Section 507(a)(4) and are therefore not entitled to priority status.

### 1.6.5  Priority Tax Claims

Since the Petition Date, the Debtors have filed all known missing tax returns. The following priority employment claims have been filed by the taxing authorities: (1) federal employment tax obligations due to the IRS in the total amount of $959,874.40 [Claim No. 16-5]; (2) State of Michigan withholding tax

liabilities due to the Department of Treasury in the total amount of $153,224.77 [Claim No. 18-3]; and (3) unemployment contributions due to the Unemployment Insurance Agency ("UIA") in the total amount of $174,431.85 [Claim No. 22-2]. Graceway's unpaid employment tax obligations, including the interest on the taxes, constitute priority claims against Graceway. The unpaid penalties and interest on the penalties associated with the unpaid taxes are general unsecured claims against Graceway.

In addition to the employment tax liabilities, the Michigan Department of Health and Human Services ("MIHHS") has filed a total claim in the amount of $2,463,559.06. The portion of the claim attributable to Graceway's unpaid Quality Assurance Assessment Program (the "Bed Tax") in the amount of $1,059,598.90 [Claim No. 24-1] is entitled to priority status under Section 507(a)(8)(E) of the Bankruptcy Code.

### 1.6.6 General Unsecured Debt

The general unsecured claims against the Debtors are comprised of the Debtors' trade claims due to vendors, potential undersecured claims of the secured creditors, and the non-priority unsecured claims of the various taxing authorities. Many of the claims arose prior to the pandemic and unfortunately remained unpaid when the Debtors were unable to recover after the shutdown and were unsuccessful in their efforts to sell Graceway's business as a going concern.

### 1.6.7  Guaranteed Debt

Graceway guaranteed Silverside's debts incurred in connection with the operation of Graceway's skilled nursing facility. The Debtors have not guaranteed the obligations of any third parties.

### 1.7    Current and Historical Financial Conditions

The Debtors' accounting was not complete on the Petition Date. The Debtors and their accountants and counsel have worked diligently to complete the accounting for the period January 1, 2019 through the end of Graceway's operations on May 31, 2021. The financial records prepared by the Debtors' accountants are believed to be reliable.  A summary of the Debtors' financial data for period January 1, 2019 through May 31, 2021 is attached hereto as **Exhibit A**. A summary of the post-confirmation costs associated with the final winddown of the Debtors is attached as **Exhibit B**.

The Debtors did not conduct any post-petition operations. However, the Debtors, along with the post-petition billing company, have continued to pursue collection of the Graceway accounts receivable.  In addition, Debtors have pursued and collected preference payments for the benefit of their creditors. The Debtors filed monthly operating reports reflecting post-petition income. The Debtors' Operating Statements for each month post-petition are attached as **Exhibit C.** A

summary of Debtors' Post-Petition Income as reported on the post-petition operating reports is attached as **Exhibit D**.

### 1.8 Significant Events During the Bankruptcy Case

### 1.8.1 Cash Collateral

The Debtors have had no active operations since May 27, 2021 when all residents were moved to alternative facilities with the assistance of LARA. Consequently, it was not necessary for the Debtors to use cash collateral post-petition. All post-petition collection on the Debtors' accounts receivable have been deposited into the Graceway Debtor in Possession account maintained at Pinnacle Bank.

### 1.8.2 Joint Administration

Due to the close relationship between Silverside and Graceway, the Debtors filed a First Day Motion for Entry of an Order Directing the Joint Administration of the Silverside Case and the Graceway Case [ECF Nos. 12 and 23, respectively]. On June 27, 2021, the Court entered an Order Authorizing the Joint Administration of Related Chapter 11, Subchapter V Cases [ECF No. 28]. On July 12, 2021, the Court entered an Amended Order Authorizing Joint Administration of Related Chapter 11, Subchapter V Cases [ECF No. 54] to address the joint matrix to be maintained on behalf of the Debtors.

18

### 1.8.3 Lifecycle Management of Clinical Information Trust Agreement with MetalQuest, Inc.

In the ordinary course of its operations, Graceway maintained records relating to its residents which are subject to the protections of the Health Insurance Portability and Accountability Act ("HIPAA"), including certain personal health information, electronic protected health information and business records (the "HIPAA Records"). In order to provide that the HIPAA Records were adequately protected and to ensure that they were in compliance with the requirements of HIPAA, the HIPAA Privacy and Security Rules, and Michigan State law, including Michigan Record Retention Requirements, the Debtors filed a Motion for Entry of an Order Authorizing Graceway to Enter Into A Lifecycle Management of Clinical Information Trust Agreement with MetalQuest, Inc. (the "Records Retention Motion") [ECF No. 76]. The Records Retention Motion was granted by the Court on September 15, 2021 [ECF No. 99] (the "Records Retention Order"). On October 7, 2021, the Debtors removed the HIPAA Records from the Chippewa facility with the assistance of MetalQuest. In the ordinary course of operations and pursuant to the Records Retention Order, Graceway paid Lifecycle a contract fee of $6,712.00 and a one-time notice fee of $250.00.

### 1.8.4   Rejection and Termination of Chippewa Lease

On July 22, 2021, Chippewa filed a Motion to Compel Payment of Post-Petition Lease Obligations or, Alternatively, to Reject Lease [ECF No. 60] (the "Motion to Compel"). On August 12, 2021, pursuant to an agreement extending the response date, the Debtors filed a Response to the Motion to Compel [ECF No. 70] and on August 26, 2021, Chippewa filed its Reply to the Debtors' Response [ECR No. 82]. The Court scheduled a hearing on the Motion to Compel for September 3, 2021. Prior to the hearing, Chippewa and the Debtors reached a settlement regarding, among other things, the rejection and termination of the lease. On November 21, 2022, the Court entered an Order Granting Chippewa Valley, LLC an Administrative Expense Pursuant to 11 U.S.C. §§ 365(d)(3) and 503(b)(1)(A) awarding Chippewa Valley an administrative expense in the amount of $107,339.10 [ECF No. 158] in connection with the termination of the Chippewa Lease.

### 1.8.5   Completion of Accounting and Preparation of Tax Returns

Due to cash shortages and pressures from COVID-19, on the Petition Date, the Debtors' accounting dating from 2019 had not been completed. In addition, a number of tax returns, including several state and federal employment tax returns as well as the Silverside partnership returns, had not been prepared and filed. As

of the filing of this Plan, the accounting has been completed and the following tax returns have been filed:

a. UIA: The Debtors provided the UIA with the information necessary for completion of the quarterly reports as follows: all four (4) quarters of 2019 and 2020 and the first quarters of 2021. The UIA has filed all ten (10) quarterly reports covering the period of Graceway's operations.

b. Michigan Department of Treasury: The Debtors filed the following eighteen (18) withholding tax returns with the Michigan Department of Treasury: August, September, October, and November of 2019; January, February, March April, May, June, September, and October of 2020, and the annual 2020 return; and January, February, March, April, and May of 2021.

c. IRS: Since the Petition Date, the Debtors filed the following eleven (11) tax returns with the IRS: Forms 941: the third and fourth quarters of 2019, the first, second and fourth quarters of 2020, the first and second quarters of 2021; Forms 940: for the tax periods ending December 31, 2019 and 2020; and Forms 1065 for the 2019 and 2020 tax years.

Completing the accounting and preparing the tax returns has been a monumental task that has taken hours of time from the Debtors' accountants, counsel and insiders to complete.

### 1.8.6 Payroll Protection Program Loans

Prior to the Petition Date, Graceway received two Payroll Protection Program ("PPP") loans. In August, 2020, Graceway received $497,425.00 and an additional $497,425.00 on March 10, 2021 in PPP funds. Fifth Third served as a processing bank for the PPP Loans. The forgiveness applications have been submitted with respect to both loans and support the forgiveness of both loans in full.

### 1.8.7 Rejection of License

The Debtors stipulated with LARA and Bureau of Community and Health Systems (BCHS) to reject License No. 1070000074 used in connection with its 93 bed CON. On October 13, 2021, the Court entered an Order Granting Stipulation Allowing the Michigan Department of Licensing and Regulatory Affairs to Revoke the Skilled Nursing Home Facility License No. 1070000074 issued to Debtor Graceway South Haven, LLC in Accord with Section 362(b)(4). [Docket No. 117]

## 1.9. Projected Recovery of Avoidance Actions

### 1.9.1 Preference Claims

The Debtors reviewed the prepetition transfers in order to identify potential recoverable preferential transfers under Section 547 of the Bankruptcy Code for the benefit of the Debtors' estates and creditors. The Debtors have identified and have recovered preference claims as follows:

| Preference Party | Preference Demand | Defenses Presented | Potential Preference | Settlement Amount | Status |
|---|---|---|---|---|---|
| Carelinc | $12,715.00 | | | | No offer to settle |
| Concept Rehab | $34,942.92 | None Raised | $34,942.92 | $34,942.92 | Paid in full |
| DeBest Landscape | $7,732.09 | $912.00 payment to court officer | $6,820.00 | $3,400.00 | Settlement paid in full |
| Jeremiah DeWitt | $14,000.00 | | | | No offer to settle |
| Gordon Foods | $15,846.50 | Ordinary Course New Value | $0.00 | $0.00 | |
| Granview Healthcare, LLC | $20,603.84 | New Value | $8,727.94 | | No offer to settle |
| Pathway Health Services | $7,500.00 | New Value | $0.00 | | |
| Professional Medical | $30,284.59 | New Value Ordinary Course | $11,237.08 | $7,500.00 | Settlement paid in full |
| SNF Receivable Solutions | $46,318.33 | New Value Ordinary Course | $0.00 | | |
| South Haven Utility Service | $45,187.85 | New Value Ordinary Course Section 547(j) | | $27,112.53 | Settlement paid in full |

| | | | | | |
|---|---|---|---|---|---|
| South Haven Area Water and Sewer Authority | $29,993.97 | New Value Ordinary Course Section 547(j) | | $17,996.38 | Settlement paid in full |
| Nicolas Guibert deBruet | $24,500.00 | Ordinary Course New value | | | Judgment $27,000.00 |
| | $326,962.02 | | | $90,951.83 | |

(collectively, the "Avoidance Actions").

Debtors have determined that no additional preference recoveries are available for the estate. Carelinc, Jerimiah DeWitt, and Grandview Healthcare (the "Unresolved Preference Defendants") did not respond to Debtors' demands or refused to make a settlement offer. All of the Unresolved Preference Defendants reside outside of the Eastern District of Michigan. Due to the value of the potential preference claims, in order to pursue the claims Debtors would be required to bring suit in the district of residence of the Unresolved Preference Defendants. Debtors determined that the estate would not benefit from filing suit against the Unresolved Preference Defendants. Nicolas Guibert deBruet filed a no-asset chapter 7 bankruptcy.

All other payments made to creditors during the 90 days prior to the Petition Date were ordinary course payments, prepayments, or subject to the new value exception.

The proceeds of the Avoidance Actions shall be used to satisfy the allowed Administrative Claims against the Debtors' estates on a pro rata basis.

### 1.9.2 Insider Transactions

The Debtors' insiders consist of Anthony B. Fischer, Jr., Nicolas Guibert deBruet, Mark Prifogle, Airmed Capital, LLC, SSC Holdings, LLC, and Sajad Zalzala (collectively, the "Insiders"). During the twelve months prior to the Petition Date, other than the distributions set forth above, the distributions made to the Insiders were ordinary course compensation payments.

### 1.10. Settlements with Chippewa Valley, LLC and the Internal Revenue Service

### 1.10.1 Settlement with the Internal Revenue Service

The Debtors have reached an agreement with the Internal Revenue Service ("IRS") regarding the ERC Credits and the application of the ERC funds. The Debtors and Chippewa have agreed that the Initial ERC Claim are prepetition claims subject IRS offset rights. The IRS has agreed that the Second ERC Claim is a post-petition asset not subject to its offset rights.

The IRS has further agreed that it will distribute $82,585.47 (the "Wage Carveout") to Graceway's estate from the Initial ERC Claim for distribution on the Priority Wage Claims. The IRS will distribute $157,015.28 (the "IRS Administrative Carveout"), representing one-third (33%) of the Initial ERC Credit,

to the Graceway estate for distribution to the administrative creditors. The balance of the funds generated by the Initial ERC Claim shall be subject to the IRS offset rights. The Debtors agree that the automatic stay will be lifted, to the extent necessary, to allow the IRS to exercise its offset rights as set forth herein with respect to the Initial ERC Claim.

The IRS will disburse the Second ERC Claim to the Debtors' estates for distribution under this Plan.

### 1.10.2 Settlement with Chippewa Valley, LLC

The Debtors have reached an agreement with Chippewa regarding its distribution form the Debtors' estates under this Plan. Chippewa has agreed to accept a total distribution in the amount of $300,000.00 (the "Chippewa Settlement Amount") in satisfaction of its secured and administrative claims against the Debtors' estates. Chippewa has further agreed to waive any claim it may have to the Initial ERC Claim and that the Initial ERC Claim is a prepetition asset of the Graceway estate subject to the IRS offset rights. The IRS and the Debtors have agreed that the Second ERC Claim is a post-petition asset of the Graceway estate subject to Chippewa's secured claim.

The IRS will distribute the Second ERC Claim to the Graceway estate. Chippewa agrees that one-third of the Second ERC Claim will be set aside as a carveout for the administrative claims (the "Chippewa Carveout"). The balance of

the Second ERC will be distributed to Chippewa to be applied against the Chippewa Valley Settlement.

### 1.11 Surcharge on the Proceeds of the Debtors' Accounts Receivable and Carveout on the Preference Recoveries

The Debtors' attorneys, Strobl Sharp PLLC ("Strobl"), seek the approval of a surcharge in the amount of $48,597.38 under Section 506(c) of the Bankruptcy Code for the fees associated with the collection on Graceway's accounts receivable. Section 506(c) allows for the recovery, as a surcharge or the "reasonable, necessary costs and expenses of preserving, or disposing of, the secured creditor's collateral." 11 U.S.C. § 506(c). Strobl spent a significant amount of time working with Graceway, the accountants, and Graceway's billing company to recover on the accounts receivable. Strobl has estimated that the total fees attributable to services associated with the accounts receivable, collection on the accounts receivable, and the settlement of the claims against the various insurance carriers is in excess of $50,000.00. Through the efforts of the Strobl and the billing company Graceway was able to collect a total of $194,389.53 from the insurance carriers either directly on submitted claims or through settlements. Strobl's requested surcharge represents 25% of the accounts receivable collected through its efforts.

Graceway's pre-petition billing company was unwilling to continue to provide post-petition billing services. Strobl facilitated locating a new billing company to assist with the post-petition billing. Due to coding and other deficiencies that were identified in Graceway's billing software, Strobl was actively involved in reviewing claims, identifying coding issues, and working with the insurance carriers to resolve the balances due.

Strobl's services were reasonable and necessary to collect on the Graceway accounts receivable. Graceway's estate, and specifically the secured creditors, have benefitted significantly from the services provided by Strobl in connection with the collection and resolution of the accounts receivable. But for the Strobl services the recovery on the accounts receivable would have been negligible. A surcharge in the amount requested is reasonable and appropriate.

## ARTICLE II
## SUMMARY OF THE PLAN

The Plan proposes to pay the Debtors' creditors from the funds collected on Graceway's accounts receivable, the recoveries from the Avoidance Actions, and the proceeds of the ERC Claims. The Debtors' Projections are attached at **Exhibit F**. The Plan establishes three (3) groups and six (6) classes of claims. The Plan provides for (a) the pro rata payment in cash of the allowed Administrative Claims of Debtors' professionals, the Subchapter V Trustee, Gordon Food Services, and

the Health Care Ombudsman; and (b) the payment in full of the priority wage claims from the IRS's ERC recovery. ((a) and (b) shall collectively be referred to as the "Group Claims").

The Debtors' priority claims, other than the set off claims of the IRS, and general unsecured creditors, excluding the deficiency claims of the Debtors' secured creditors, shall receive a distribution of the proceeds that are available after payment in cash and in full of the allowed secured claims and the Group Claims. The Debtors do not anticipate that there will be funds available for a distribution to the general unsecured creditors. The Debtors' Insiders and equity security holders will receive no recovery under this Plan and shall, upon confirmation of the Plan, surrender their equity interests in the Debtors.

All creditors and equity security holders should refer to Articles I through V of this Plan for information regarding the precise treatment of their respective claims and interests. Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)

# ARTICLE III
## CLASSIFICATION OF CLAIMS AND INTERESTS

### 3.1 Unimpaired Interests

**3.1.1 Group I:** Group I shall consist of allowed Administrative Claims due to the Debtors' professionals, including Debtors' counsel, Debtors' accountants, Debtors' special healthcare counsel, the Subchapter V Trustee, the Health Care Ombudsman, and Gordon Food Service, Inc. The Group I claims shall be paid on a pro rata basis with all other allowed Administrative claims from the proceeds of the Avoidance Actions. The anticipated distribution to the Group I claimants is set forth in the projections attached as **Exhibit F**.

The administrative claim of Chippewa shall be resolved through the settlement payment to Chippewa.

**3.1.2 Group II:** Group II shall consist of the pre-petition Priority Wage claims of the Debtors' employees. The Group II claims total $82,595.47. The Group II claims reflected on **Exhibit G** shall be paid in full through a carveout from the Initial ERC.

### 3.2 Impaired Classes

**3.2.1 Class I:** Class I shall consist of the secured claim of McKesson Corporation in the amount of $51,709.52 . The Class I claim of McKesson shall be paid from the proceeds of the Debtors' accounts receivable after the payment of the

30

surcharge for the Debtors' professional fees. McKesson shall share in the surcharge for professional fees in the amount of $17,298.69, reducing the claim to $34,410.83. McKesson's Class I claim shall receive a distribution in the amount of $34,410.83.

The liens supporting the Class I claim shall remain in full force and effect until paid in full, less the reduction based on the Class I creditor's pro rata share of surcharge for the Debtors' professional fees.

Class I is impaired.

**3.2.2** <u>**Class II:**</u> Class II shall consist of the secured claim of High Speed in the amount of $14,000.00. The Class II claim shall share in the surcharge for professional fees in the amount of $14,000.00. The Class II claim shall receive no distribution.

Class II is impaired to the extent it is reduced by the surcharge for professional fees against the Debtors' accounts receivable.

**3.2.3** <u>**Class III:**</u> Class III shall consist of secured claim of Chippewa in the amount of $668,189.00. The Class III, along with Chippewa's administrative claim, shall receive a distribution in the total amount of $300,000.00 from (i) the proceeds of the Graceway accounts receivable after the payment of the collection costs due to the Debtors' billing company and the payment of the surcharge for the Debtors' professional fees, (ii) the Second ERC Claim less the agreed carveout for

administrative expenses, and (iii) the proceeds of the preference recoveries to the extent necessary.

The liens supporting the Class III claim shall remain in full force and effect until the Chippewa Settlement Amount has been paid in full.

Class III is impaired.

**3.2.4 <u>Class IV</u>:** Class IV shall consist of the priority tax claims of the IRS, the State of Michigan, Department of Treasury, the UIA, and the State of Michigan, Department of Health and Human Services. The priority tax claims shall be paid on a pro-rata basis in equal monthly payments from the excess proceeds of the Graceway accounts receivables, if any, and the proceeds of the Avoidance Actions to the extent not used to satisfy the Administrative Claims.

The automatic stay shall be lifted to allow the IRS to exercise its offset rights to apply the funds generated by the Initial ERC Claim, after the distribution of the Wage Carveout and the IRS Administrative Claim Carveout, in its discretion to its Class IV Claim.

The Class IV claims shall receive interest at the applicable statutory rate. The Class IV claim of the UIA shall accrue interest at the statutory rate pursuant to MCL 421.15(b) of 1% per month or 12% per annum, calculated on a day-to-day basis.

Class IV is impaired.

**3.2.5 Class V:** Class V shall consist of the allowed general Unsecured Claims of Creditors of the Debtors, other than the claims of the Debtors' insiders, to the extent such exist, including the Debtors' trade creditors, the deficiency claims of the Debtors' secured creditors and any penalty and interest on penalties due to the various taxing authorities. On the Petition Date, the Debtors' combined non-insider general unsecured trade debt totaled approximately $1,940,823.93. In addition, Healthteq's secured claim against Silverside in the amount of $459,415.04 is wholly unsecured due to the lack of collateral. The Department of Labor ("DOL") wage claim in the amount of $26,458.67 is a wholly unsecured due to the wage claims accruing outside the scope of Section 507(a)(4). The Debtors' have not estimated the value of the various taxing authorities' potential general unsecured claims for penalties and interest on penalties. In the event there are excess proceeds available from the collection of accounts receivable, the recovery of the ERC Claims and the resolution of the Avoidance Actions, after the payment of all Group I, Group II, Class I, Class II, Class III, and Class IV claims, and payment of the final winddown expense as set forth in **Exhibit B**, such proceeds will be distributed to the Class V Creditors on a pro-rata basis when funds become available. The Debtors do not anticipate that there will be any funds available for distribution to the Class V creditors.

Any Class V General Unsecured Claim that was identified as disputed, unliquidated, or contingent in the Debtors' Schedules shall be deemed disallowed unless such Creditor holding a claim identified as disputed, unliquidated or contingent has timely filed a Proof of Claim.

The Class V is impaired.

**3.2.6  <u>Class VI:</u>**  Class VI shall consist of the claims of the Debtors' insiders, including Mark Prifogle, Nicolas Guibert deBruet, Airmed Capital, LLC, Anthony Fischer, Jr., SSC Holdings, LLC, and Sajad Zalzala.  The Class VI claims shall include any claim for debt owed by the Debtors to the Class VI creditor and the equity interests of Class VI creditors.  The Class VI debts interests shall be deemed cancelled as of the Effective Date of this Plan. The Class VI interests will receive no distribution under this Plan.

The Class VI is impaired.

The Debtors shall continue to exist as Michigan limited liability companies, as Liquidating Debtors, for the limited purposes of completing the obligations under this Plan.

Payments to be made pursuant to this Plan shall be from funds derived from the sources as set forth herein.  All of the Debtors' disposable income, to the extent such exists, shall be distributed under this Plan.

The Debtors will not make any payments and will not incur any debts unless the debts and the payments comply with the terms and conditions of this Plan.

## ARTICLE IV
## EXECUTORY CONTRACT CLAIMS

All executory contracts of the Debtors shall be deemed rejected immediately upon confirmation of this Plan.

Any Creditor who has a Claim as a result of any rejected executory contract shall have thirty (30) days after the Confirmation Date to file a Proof of Claim, failing which such Claim shall be disallowed in its entirety.

The Debtors may file an objection to any Proof of Claim filed pursuant to this Article IV in accordance with Article XV.

## ARTICLE V
## FUNDING AND IMPLEMENTATION OF THE PLAN

### 5.1    Funding of the Plan

Pursuant to Section 1190 of the Bankruptcy Code, the Debtors must show that it will have sufficient revenue to make the payments required by the Plan. The Debtors have collected on all potential outstanding Graceway accounts receivable. All such collections shall be deposited into the Graceway DIP account for disbursement under this Plan.  On the Petition Date, the Debtors had no personal property that could be liquidated for the benefit of creditors.

On December 10, 2021, the Debtors submitted the Initial ERC Claim in the amount of $427,371,24 refundable credits. The Second ERC Claim was submitted directly to the prompt determination unit on June 3, 2022. The ERC Claims have been audited and the final audit reports agreed to by Graceway. The ERC Claims have been approved in the total amount of $623,751.47.

The Plan shall be funded through the proceeds of the collected Graceway's accounts receivable, the recovery of the ERC Claims, and the collected proceeds of the Avoidance Actions. The Debtors reserve the right to amend the Plan.

Upon the Effective Date, unless otherwise released by the Plan, the Liquidating Debtors shall have, and are hereby assigned standing to pursue any and all Causes of Action, including Avoidance Actions, that have not been fully liquidated as of the Effective Date.

### 5.2 <u>Termination of the Subchapter V Trustee</u>

**5.2.1** If the Plan is confirmed under section 1191 of the Bankruptcy Code, the Subchapter V Trustee shall be designated as the Disbursing Agent and shall continue to exercise powers and perform those duties specified in section 1183 and 1194 of the Bankruptcy Code as the Disbursing Agent until the Debtors' estates have been fully administered.

**5.2.2** Upon confirmation, the Debtors shall provide the Disbursing Agent with the appropriate documentation and paperwork to substitute in as the signatory

on the Debtor-in-Possession checking account at Pinnacle Bank (the "Pinnacle Bank Account"). Post-confirmation, the Subchapter V Trustee shall have the sole authority over the Pinnacle Bank Account. Upon confirmation, the Subchapter V Trustee will become the Disbursing Agent. The Subchapter V Trustee will regularly sweep the funds from the Debtor-In-Possession account into his designated Trustee account for purposes of making all disbursements.

### 5.2.3  Post Confirmation Services to the Debtors

Any services performed or expenses incurred by any professional on behalf of the Debtors or the Liquidating Debtors with respect to this Case after the Effective Date shall not be subject to the prior review and approval of the Court. All fees and expenses of the Liquidating Debtors or the Disbursing Agent arising after the Confirmation Date shall be billed directly to the Liquidating Debtors and shall be paid by the Liquidating Debtors in the ordinary course of business. The post-confirmation expenses are limited to the expenses set forth in the winddown budget (the "Winddown Expenses") set forth in **Exhibit B.** A reserve in the amount of $7,500.00 to satisfy the Winddown Expenses of the Subchapter 5 Trustee shall be established by the Disbursing Agent.

The Debtors' accountant has completed the Form 1065 for the tax year 2021 which will be filed before confirmation. Debtors' counsel will complete the post-

confirmation reports on behalf of the Disbursing Agent and prepare and file the final Report with the Court.

## ARTICLE VI
## TAX CONSEQUENCES

Debtors are unable at this time to fully determine the effect that the proposed Liquidating Plan will have upon their tax attributes. The Debtors are both limited liabilities treated as partnerships for tax purposes and therefore do not incur an income tax liability. Since the Debtors are liquidating and will be filing a final partnership tax return for the tax year 2021, any flow through issues and income tax implications from the discharge of any of its debt due to this bankruptcy proceeding will remain the responsibility of the members. Debtors recommend that the Creditors consult their tax specialist relative to the tax consequences of the Plan to the Creditors.

No ruling has been sought or obtained from the IRS with respect to any of the tax aspects of the proposed Plan and no opinion of counsel has been obtained by the Debtors with respect thereto. No representations or assurances are being made with respect to the federal income tax consequences as described herein. Certain types of claimants and interest holders may be subject to special rules not addressed in this summary of federal income tax consequences.

## ARTICLE VII
## DISCHARGE

The Debtors are liquidating debtors and, therefore, are not seeking a discharge.

## ARTICLE VIII
## CONSEQUENCES OF DENIAL OF CONFIRMATION OF PLAN

If the Court fails to confirm the Plan, these Chapter 11 proceedings may continue, and the Debtors may seek confirmation of an amended or modified Plan. Alternatively, the Debtors' Chapter 11 cases may be converted to Chapter 7 liquidation cases or dismissed.

## ARTICLE IX
## VOTING AND RIGHT OF WITHDRAWAL

### 9.1    Voting Procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interests, which are impaired under the plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the plan.

Creditors that hold claims in more than one (1) impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a

claim in more than one (1) class and who has not been provided with enough ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtors' Schedules of Assets and Liabilities <u>other</u> than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to section 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the Debtors' attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtors' attorney.

**9.2**     **Acceptance**

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

**9.3**     **Withdrawal**

Debtors reserve the right to withdraw, otherwise amend, or modify this Plan prior to confirmation.

**ARTICLE X**
**DEFINITIONS**

As used in this Plan, the following terms shall have the meanings specified below, unless the context requires otherwise:

**10.1**   "Administrative Claim" means costs and expenses of administration of the Case allowed under §§503(b) and 507(a) (1) of the Bankruptcy Code, and the fees of the United States Trustee under 28 U.S.C. §1930(a) (6).

**10.2** "Administrative Creditor" shall mean any Creditor entitled to payment of an Administrative Expense.

**10.3** "Allowed Claim" or "Allowed Interest" means a Claim against or Interest in the Debtors to the extent that:

    A.    A Proof of Claim or Interest was:

        1.    Timely filed;

        2.    Deemed filed pursuant to §1111(a) of the Code; or

        3.    Filed late with leave of the Bankruptcy Court after notice and an opportunity for hearing given to Debtors, and counsel for Debtors; <u>and</u>

    B.    The Claim is not a Contested Claim or a Contested Interest, <u>or</u>

    C.    The Claim is allowed (and only to the extent allowed) by a Final Order of the Bankruptcy Court.

**10.4** "Avoidance Actions" means all claims granted to the Debtors or Liquidating Debtors under sections 544-553 of the Code, including, but not limited to, the Avoidance Actions described herein.

**10.5** "Ballot" shall mean the official Bankruptcy Form No. 14, or a document prepared to substantially conform to same being sent to all Creditors and parties-in-interest entitled to vote for or against the Plan.

**10.6** "Bankruptcy Code" or "Code" means the Bankruptcy Reform Act of 1978, as amended (11 U.S.C. §§101, <u>et</u> <u>seq</u>.).

**10.7** "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan and any court having jurisdiction over any appeals.

**10.8** "Bankruptcy Rules" or "Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court that became effective on August 1, 1991 and any amendments thereto. To the extent applicable, Bankruptcy Rules also refers to the Local Rules of the U.S. District Court for the Eastern District of Michigan, as amended and the Local Bankruptcy Rules for the Eastern District of Michigan, as amended.

**10.9** "Business Day" means any day, other than a Saturday, Sunday or "Legal Holiday," as that term is defined in Bankruptcy Rule 9006(a).

**10.10** "Case" or "Cases" means the cases currently pending before the United States Bankruptcy Court for the Eastern District of Michigan styled as *In re Silverside Senior Living, LLC* (Case No. 21-44887-lsg) and *Graceway South Haven, LLC* (Case No. 21-44888-lsg).

**10.11** "Chippewa" means Chippewa Valley, LLC an Illinois limited liability company.

**10.12** "Claim" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, contested, disputed, undisputed, legal, equitable, secured, or unsecured,

or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, contested, disputed, undisputed, secured, or unsecured.

**10.13** "Class" means a class of holders of Claims or Interests described in Article III of this Plan.

**10.14** "Confirmation Date" means the date upon which the Bankruptcy Court shall enter the Confirmation Order.

**10.15** "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court with respect to the confirmation of the Plan.

**10.16** "Confirmation Order" means the order of the Bankruptcy Court, which confirms this Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

**10.17** "Contested Claim" means any Claim as to which Debtors or any other party in interest has interposed an objection or commenced an adversary proceeding in accordance with the Bankruptcy Code, Bankruptcy Rules and this Plan, which objection has not been determined by a Final Order.

**10.18** "Creditor" means any holder of a Claim against the Debtors.

**10.19** "Debtors" means Silverside Senior Living, LLC and Graceway South Haven, LLC.

**10.20** "Disbursing Agent" shall mean the Subchapter V Trustee. If the Subchapter V Trustee is unable to serve, then the Disbursing Agent shall be an individual selected by the Debtors from the current panel of Chapter 7 Trustees maintained by the Office of the United States Trustee or an appropriate individual acceptable to the Debtors..

**10.21** "Effective Date" shall mean the sixtieth (60th) business day after the Confirmation Order becomes a Final Order.

**10.22** "ERC Claims" shall mean Graceway's Employee Retention Credit claims for the fourth quarter of 2020, the first quarter of 2021, and the second quarter of 2021.

**10.23** "Final Order" means an Order of the Bankruptcy Court as to which (i) the time for appeal has expired and no appeal has been timely taken; or (ii) any timely appeal has been finally determined or dismissed; or (iii) an appeal has been timely taken, but such order has not been stayed within ten (10) days after the filing of such appeal.

**10.24** "Graceway" means Graceway South Haven, LLC, a Michigan limited liability company whose sole member is Silverside Senior Living, LLC.

**10.25** "Health Care Ombudsman" means Deborah Fish.

**10.26** "Holder" shall mean a Person holding a Claim, Interest, or Lien, as applicable, with respect to the Debtors.

**10.27** "Impaired" means a Claim treated under this Plan, unless the Plan:

(a)    leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest; or

(b)    Notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default—

   (1)    cures any such default (other than defaults relating to (i) any penalty interest rate or provision arising from a non-monetary default by the Debtors; (ii) the solvency or financial condition of the Debtors or (iii) the commencement of this Case) that occurred before or after the commencement of the Case;

   (2)    Reinstates the maturity of such Claim or Interest, as such maturity existed before such default;

   (3)    compensates the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; and

   (4)    Does not otherwise alter the legal, equitable or contractual rights to which such Claim or Interest entitles its holder.

**10.28** "Initial ERC Claim" shall mean Graceway's Employee Retention Credit for the fourth quarter 2020 and the first quarter 2021.

**10.29** "Insider" means each Anthony B. Fischer, Jr., Nicolas Guibert deBruet, Mark Prifogle, Airmed Capital Holdings, SSC Holdings, LLC, and Sajad Zalzala.

**10.30** "Insiders" means, collectively, the Insiders.

**10.31** "Interest" means the interests of Debtors as defined in the Code.

**10.32** "Interest Rate" means (a) with respect to Claims entitled to interest under § 506 of the Bankruptcy Code and this Plan and having an applicable contractual rate of interest, the lowest rate of interest provided in such contract, without regard to any default by Debtors, (b) with respect to all other Claims entitled to interest under the Bankruptcy Code and this Plan, the Prime Rate of Interest as of the Confirmation Date, or (c) with respect to (a) or (b) such other interest rate as may be determined by a Final Order of the Bankruptcy Court.

**10.33** "Liquidating Debtors" shall mean Silverside Senior Living, LLC and Graceway South Haven, LLC, to the extent they continue to exist to implement the terms of this Plan after the Effective Date.

**10.34** "Petition Date" means the date the Debtors filed these jointly administered cases, which date is June 7, 2021.

**10.35** "Plan" or "Liquidating Plan" means this Plan, as it may be altered, amended, modified or supplemented from time to time.

**10.36** "Priority Claim" means a Claim entitled to priority under any section of the Bankruptcy Code except claims specified in §507(a)(1) of the Code.

**10.37** "Priority Wage Claims" shall mean the wages due to Debtors' former employees for unpaid wages pursuant to 11 U.S.C. § 507(a)(4) as reflected on **Exhibit G**.

**10.38** "Professional Fees" means the fees and reimbursement for disbursements owed to attorneys, accountants, or other professionals of the Debtors whose employment has been approved by the Bankruptcy Court.

**10.39** "Second ERC Claim" shall mean Graceway's Employee Retention Credit for the second quarter of 2021.

**10.40** "Secured Claim" shall mean a Claim secured by a lien on property in which the Estate has an interest but only to the extent of the value of the Creditor's interest in the Estate's interest in such property as of the Petition Date and only if such Secured claim is Allowed.

**10.41** "Silverside" means Silverside Senior Living, LLC, a Michigan limited liability company whose members are Airmed Capital Holdings (77%), SSC Holdings, LLC (10%), Mark Prifogle (10%), and Sajad Zalzala (3%).

**10.42** "Subchapter V Trustee" means Charles M. Mouranie.

**10.43** "Unsecured Claim" means a Claim that is not a Secured Claim and is not an Administrative Claim or a Priority Claim.

**10.44** "Unsecured Creditor" shall mean any Creditor that holds an Unsecured Claim.

# ARTICLE XI
## EFFECT OF CONFIRMATION

**11.1** Confirmation of the Plan shall modify and alter the rights of all Creditors and holders of Interests as provided herein on the Effective Date. Creditors or holders of Interests shall be prohibited from asserting any further claims against the property of the Debtors based upon any act, transaction, or indebtedness which is the subject matter of any Claim or Interest, or based upon any guarantee of collection, payment or otherwise made by the Debtors as to any obligation of any persons, firm or entity, unless the Plan provides, or the Court specifically orders otherwise. On the Effective Date, the assets of the Debtors not otherwise transferred prior to the Effective Date, shall re-vest in the Liquidating Debtors.

**11.2** On and after the Effective Date, the Liquidating Debtors shall continue the winddown process in the ordinary course under the terms of this Plan and applicable non-bankruptcy law to the extent such winddown is not completed prior to the Effective Date. The Debtors, Liquidating Debtors and Disbursing Agent shall be authorized to incur the expenses set forth in **Exhibit B** and as required to meet the Liquidating Debtors' non-bankruptcy law obligations.

**11.3** Except as otherwise provided in the Plan, pursuant to the applicable provisions in the Bankruptcy Code, including, but not limited to, Section 553, and

non-bankruptcy law or agreement of the parties, and except in the case of the Group II Claim and the Class III Claim, Debtors, Liquidating Debtors and/or the Disbursing Agent may set-off against any Allowed Claim any distributions to be made with respect to such allowed Claim, any Claims, rights, and Causes of Action of any nature that the Debtor and/or Liquidating Debtor may hold against the Holder of such Allowed Claim or such Holders' predecessor-in-interest, as applicable, Claimant.

### ARTICLE XII
### MODIFICATION OF THE PLAN

**12.1**  After confirmation, the Debtors and Liquidating Debtors may, with leave of the Bankruptcy Court, and upon notice and opportunity for hearing to the affected Creditor(s) only, remedy any defect or omission, reconcile any inconsistencies in the Plan or in the Confirmation Order or otherwise modify the Plan.

**12.2**  Only if the Bankruptcy Court determines that the modification affects all the Creditors, or if the Debtors and Liquidating Debtors propose a material modification affecting all Creditors, shall such modification be governed by §1127 of the Bankruptcy Code.

# ARTICLE XIII
## JURISDICTION OF THE COURT

**13.1** Notwithstanding confirmation of the Plan, the Bankruptcy Court shall retain jurisdiction for the following purposes:

A. To determine all objections to the allowance of Claims;

B. To approve or disapprove any compromise by the Debtors of any Claim;

C. To determine all disputes arising under the Plan, including any dispute over any action taken by the Disbursing Agent, and to enforce, interpret and administer the terms and conditions of the Plan;

D. To determine any applications for allowance of compensation and reimbursement of expenses as may be required for pre-confirmation services;

E. To determine any applications for rejection, assumption, or assignment of executory contracts and the allowance of any claims resulting from the rejection thereof or from the rejection of executory contracts pursuant to the Plan;

F. To determine any applications, adversary proceedings, and contested and litigation matters pending in the Case at the Confirmation Date or thereafter filed;

G. To determine any applications on file for approval of settlement agreements and entering and enforcing all appropriate orders in connection therewith;

H. To modify any provisions of the Plan pursuant to the Rules, the Code, and provisions of the Plan;

I.      To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

J.      To determine such other matters provided in the Confirmation Order as may, from time to time, be authorized under the provisions of the Code or any applicable law;

K.      To enforce all orders, judgments, injunctions, and rulings in connection with this proceeding; and

L.      To enter such orders that may be necessary or appropriate to aid in confirmation and to facilitate implementation of the Plan.

## ARTICLE XIV
## TITLE TO PROPERTY

**14.1**   All property of the Debtors and Debtors in Possession not transferred prior to the Effective Date shall vest in the Liquidating Debtors on the Effective Date.  The Debtors shall be discharged from its status as Debtors and Debtors in Possession and the affairs and business of the Debtors shall thereafter be conducted without Court involvement except as may be governed by Articles XII, XIII, and XIV of this Plan.

## ARTICLE XV
## PROOFS OF CLAIMS/OBJECTIONS TO CLAIMS

**15.1**   The Court set a deadline of October 7, 2021, as the bar date for non-governmental proofs of claim to be filed with the Court.  Governmental units are to file proofs of claim one hundred eighty (180) days from the Petition Date.  Except as otherwise set forth in this Plan as an Allowed Claim, the Debtors and

Liquidating Debtors may object to the allowance of any Claim, whether listed on the schedules filed by Debtors or filed by any Creditor, on or before the later of (a) sixty (60) days from the date of service of any Proof of Claim upon the Debtors or Liquidating Debtors, or, (b) sixty (60) days after the Effective Date.

## ARTICLE XVI
## DEFAULT

**16.1** Upon the failure of the Debtors or Liquidating Debtors to make any payment due under this Plan which is not cured within sixty (60) days of the mailing of a written notice of default by the Creditor, such Creditor may seek appropriate relief from this Court.

## ARTICLE XVII
## MISCELLANEOUS PROVISIONS

**17.1** Except as otherwise set forth in this Plan, the Debtors and Liquidating Debtors each have standing to pursue any and all Avoidance Actions on the behalf of creditors, to the extent such exist, and it is in the Debtors' and the Liquidating Debtors' sound business judgment whether to pursue or waive such actions.

**17.2** Any Professional Fees incurred post-confirmation by any professional whose employment required the approval of the Bankruptcy Court during the pendency of the Case, may be paid by the Debtors and Liquidating Debtors without the prior review and approval of the Bankruptcy Court.   All Professional

Fees incurred pre-confirmation may only be paid once the Court has approved such fees and expenses.

Notwithstanding any provision of the Bankruptcy Code or Rules, including without limitation Fed. R. Bank. P. 2016, after the Confirmation Date no professional shall be required to disclose payments received from the Debtors or Liquidating Debtors for services provided after the Confirmation Date. All fees and expenses arising after the Confirmation Date shall be billed directly to the Debtors and Liquidating Debtors and the Disbursing Agent and the Bankruptcy Court shall only review that portion to which the Debtors, Liquidating Debtors, and/or the Disbursing Agent objects prior to the closing of the cases. The Disbursing Agent shall pay, in accordance with the terms of any invoice with respect to such fees, the portion as to which there is no objection.

**17.3** Notwithstanding anything in this Plan to the contrary, the Debtors and Liquidating Debtors shall not be obligated to make any payments towards any Contested Claim. Further, the Debtors shall not be required to make any payments for an Allowed Claim to any Creditor if the Debtors have filed a motion, objection, adversary proceeding, state court proceeding or other similar notice against such Creditor before the Confirmation Date alleging an objection, claim, cause of action, offset, or counter-claim, such that if sustained and not paid by such Creditor

would result in a disallowance of such Allowed Claim in accordance with §502(d) of the Code.

**17.4.** All parties in interest, including without limitation any Creditor, shall be required to execute any document reasonably requested by the other to memorialize and effectuate the terms and conditions of this Plan. This shall include without limitation any execution by Creditors of any UCC or mortgage terminations and releases.

**17.5.** When the Debtors, Liquidating Debtors, or the Disbursing Agent have made all payments and met all obligations required under this Plan all restrictions, negative covenants and other limitations on the Debtors and Liquidating Debtors shall terminate.

**17.6.** Any lien or encumbrance of any Creditor, which is not specifically preserved by this Plan, shall be, and hereby on the Effective Date is, extinguished, released and terminated. Any Creditor holding such a lien or encumbrance shall be required to execute any document reasonably requested by the Debtors and Liquidating Debtors to memorialize said termination. If a Creditor fails to cooperate with the Debtors, the Debtors may seek to enforce this provision within the Bankruptcy Court or, at the Debtors' or Liquidating Debtors' option, the Debtors may file a certified copy of the Confirmation Order and a copy of this Plan with the appropriate register of deeds or Secretary of State's office and the filing of

the certified Confirmation Order and this Plan shall serve to terminate such lien or encumbrance. For the avoidance of doubt, the liens supporting the Class III Claim of Chippewa shall remain in full force and effect until paid in full.

**17.7.** This Plan and the Confirmation Order shall inure to the benefit of, and be binding upon, all parties in interest and their respective successors and assigns.

**SILVERSIDE SENIOR LIVING, LLC,** a Michigan limited liability company

By:     /s/  Anthony B. Fischer, Jr.
          Anthony B. Fischer, Jr.
Its:   CEO

**GRACEWAY SOUTH HAVEN, LLC,** a Michigan limited liability company

By:     /s/  Anthony B. Fischer, Jr.
          Anthony B. Fischer, Jr.
Its:   CEO

**STROBL SHARP PLLC**

*/s/    Lynn M. Brimer*
LYNN M. BRIMER (P43291)
PAMELA S. RITTER (P47886)
Strobl Sharp PLLC
Attorneys for Debtors
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI 48304-2376
Telephone: (248) 540-2300
Facsimile: (248) 645-2690
E-Mail: lbrimer@strobllaw.com
        pritter@strobllaw.com

Dated: October 14, 2022

*S&B\85370\002\MISC\SB797710.DOC

56